# Illinois Official Reports

## Appellate Court

*Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008

| | |
|---|---|
| Appellate Court Caption | NORTHWESTERN MEMORIAL HOSPITAL, Plaintiff-Appellee, v. FAROUK ADAM SHARIF, Defendant-Appellant (Tierney Sharif, Defendant). |
| District & No. | First District, Second Division<br>Docket No. 1-13-3008 |
| Filed | December 2, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's judgment finding that defendant violated the Uniform Fraudulent Transfer Act by fraudulently conveying assets of his company to himself in order to avoid the payment of plaintiff's judgment for unpaid rent in an amount over $250,000 for premises defendant had abandoned was affirmed, notwithstanding defendant's contentions that the trial court failed to consider all 11 factors of fraud set forth in the Act and that the judgment was against the manifest weight of the evidence, since the Act does not require consideration of all 11 factors of fraud and in defendant's case, the trial court properly applied the Act, and the evidence clearly established that defendant fraudulently distributed the proceeds of a real estate transaction to himself in contravention of the Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-29570; the Hon. Thomas R. Allen, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Voelker Litigation Group, of Chicago (Daniel J. Voelker, of counsel),
for appellant.

Holland & Knight LLP, of Chicago (Christopher W. Carmichael and
Darren H. Goodson, of counsel), for appellee.

Panel

JUSTICE PIERCE delivered the judgment of the court, with opinion.
Presiding Justice Simon and Justice Liu concurred in the judgment
and opinion.

**OPINION**

¶ 1     Defendant, Farouk Adam Sharif, appeals the judgment of the circuit court of Cook County
finding he violated the Uniform Fraudulent Transfer Act (Act) (740 ILCS 160/1 *et seq.* (West
2008)) for fraudulently conveying to himself assets of his company to avoid payment to the
plaintiff creditor. Appellant argues: (1) that the trial court erred by failing to consider all 11
factors of fraud listed in the Act; and (2) the trial court's judgment was against the manifest
weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

¶ 2                                    BACKGROUND
¶ 3     In 2003, Randolph Equities, LLC, a real estate investment firm, rented office space at 211
East Ontario Street, in Chicago, Illinois. Defendant, Farouk Adam Sharif,[1] was the founder,
president, chief executive officer (CEO), chief operating officer (COO) and managing member
of Randolph Equities until it was involuntarily dissolved in April 2010. Codefendant, Tierney
Sharif, is the ex-wife of Adam. Plaintiff Northwestern Memorial Hospital acquired ownership
of the real estate and the lease in 2008. In September 2008, Randolph Equities had no money
and stopped paying rent owed to Northwestern.

¶ 4     When Randolph Equities abandoned the premises and the lease in October 2009, plaintiff
sent Adam a certified letter informing him that Randolph Equities was in default and that
$173,952.21 was owed. In November 2009, plaintiff sent Adam, his attorneys, and Randolph
Equities' in-house counsel certified letters informing them of the default and past-due
amounts. In December 2009, plaintiff filed a lawsuit, separate from this litigation, for the
unpaid rent (rent litigation). In June 2010, plaintiff obtained a judgment against Randolph
Equities in the amount of $270,333.61. During postjudgment collection proceedings plaintiff
learned that Randolph Equities had no assets; however, it was a named plaintiff in a recently
settled 2005 lawsuit against Carbon Capital, Inc., and BlackRock, Inc. (BlackRock litigation).

¶ 5     Randolph Equities and the Sharifs brought the BlackRock litigation for breach of contract
related to a failed Florida real estate transaction. Randolph Equities was the only contract

_____

[1]In defendant Farouk Adam Sharif's briefs, he refers to himself as Adam. To avoid any confusion,
we will do the same.

purchaser of the real estate involved in the underlying litigation. In February 2010, while the rent litigation was pending, Randolph Equities and the Sharifs settled the BlackRock litigation for $3.3 million. Adam executed the settlement on behalf of Randolph Equities in his capacity as CEO. Although Randolph Equities was the only contract purchaser, none of the BlackRock settlement proceeds were received by Randolph Equities. The BlackRock settlement was disbursed in three parts: $975,000 to the BlackRock litigation attorneys in settlement of their fees and $2,015,000 to a Chicago law firm. The Chicago law firm then distributed $1,351,000 to Adam and $974,000 to Tierney. Tierney never held any position with, or had any personal interest in, Randolph Equities. According to the BlackRock settlement agreement, Tierney's share was in part payment of Adam's obligations under their marital settlement agreement and in part payment of her share of the BlackRock settlement.

¶ 6    The remaining $310,000 was distributed to Jacob Meister, a former in-house counsel for Randolph Equities, pursuant to a separate settlement agreement between Randolph Equities, the Sharifs and Meister, to release Meister's lien against the settlement and to establish a $50,000 escrow to satisfy certain specified Randolph Equities creditors, mostly law firms. This agreement also included a confidentiality provision instructing Meister on how to respond to any creditor inquiries regarding the BlackRock settlement and prohibiting Meister from disclosing the existence of the creditor escrow account.

¶ 7    Upon learning of the BlackRock settlement, plaintiff filed the instant suit alleging that Randolph Equities was entitled to part or all of the BlackRock settlement because the Sharifs fraudulently transferred the settlement funds to themselves instead of Randolph Equities in contravention of the Act. Plaintiff's complaint alleged two causes of action: imposition of a constructive trust over the fraudulent transfer of the BlackRock settlement funds and unjust enrichment.

¶ 8    Adam was served with four requests to produce documents, which generated two motions to compel discovery. Plaintiff sought production of the BlackRock settlement information, any related accounting records and any documentation relating to funds Adam provided to Randolph Equities. Ultimately, Adam produced three documents: the BlackRock attorney fees settlement agreement, the marital settlement agreement and the Meister settlement agreement. Adam claimed that he did not have any documentation regarding funds he provided to Randolph Equities, claiming that any such documentation was in the possession of his Chicago-based accountant and were available upon plaintiff's request. Those documents were never produced.

¶ 9    A bench trial was held on May 9, 2013. Plaintiff and Tierney filed a joint stipulation of facts that established that Tierney was never an officer or director of Randolph Equities; she was a named plaintiff in and was paid from the BlackRock settlement; and she did not personally invest funds in the failed BlackRock real estate transaction. Various trial exhibits included the instant complaint, the Northwestern lease, letters of default sent on October 9 and November 4, 2009, the BlackRock litigation complaint, the BlackRock litigation settlement, a bank statement from the Chicago-based law firm that received the previously mentioned BlackRock proceeds, the settlement agreements with the BlackRock attorneys and Meister, and the $270,333.61 judgment order in favor of Northwestern.

¶ 10   Adam, called as an adverse witness, was the only witness. Adam testified that Randolph Equities vacated the East Ontario Street offices in September 2008. He informed plaintiff at

that time, but "[t]hey wouldn't even accept the keys." He was served with the rent litigation complaint in March or April 2010, after the BlackRock settlement in February 2010.

¶ 11    Adam stated that when he authorized the BlackRock settlement disbursements in March 2010, he was not aware of the rent litigation. Adam testified that over the course of a decade, he gave Randolph Equities approximately $10 million for its operating expenses. Adam amassed these funds while working as the managing director of GMAC Commercial Mortgage, where, for several years, he earned a "seven figure" income. Adam maintained that these funds were loans to Randolph Equities and Randolph Equities was indebted to him for these monies. These loans were the only source of funds for the corporation. When Adam ran out of money, Randolph Equities became insolvent. His portion of the BlackRock settlement was partial repayment for those loans. He believed that Randolph Equities was free to choose which creditors to pay, so he paid himself first. Adam did not produce any documentation to support his testimony that the $10 million was a loan. He maintained that his financial records were available for plaintiff's inspection at his accountant's office in Chicago.

¶ 12    Adam signed the BlackRock settlement in his capacity as CEO of Randolph Equities. Randolph Equities was "the named purchaser" for the Florida real estate and the borrower for the loans at issue in the BlackRock litigation.

¶ 13    After considering all the evidence, the trial court entered judgment in plaintiff's favor on its claim for imposition of a constructive trust over the BlackRock settlement funds and found the count for unjust enrichment moot. The trial court observed that an intent to defraud can be proven by circumstantial evidence and generally referenced nine factors listed in the Act that may be considered. 740 ILCS 160/5(b) (West 2008). The court found that seven of the nine factors were satisfied such that a presumption of fraud was established. The trial court found that it did not believe Adam's testimony that he "loaned" Randolph Equities $10 million or that he was a preferred creditor especially where there was no "corroborating document, evidence of any sort, a note, anything, or even a letter memorializing" the loans. The trial court found that Adam's testimony did not rebut the presumption of fraud. Specifically, the trial court stated:

> "There's been clear and convincing evidence presented here and it has not been rebutted that *** Randolph was methodically and intentionally and carefully put on the sidelines here by making sure that the name of the entity didn't appear on any check *** and only appeared when necessary to sign releases and release the flow of money to the other people *** that the presumption of fraud here has not been overcome just by the general claim that these were loan[s]."

Adam timely filed this appeal. Defendant Tierney did not appeal.

¶ 14                                ANALYSIS

¶ 15    Adam argues that the trial court did not properly apply the Act in this case and that the trial court's judgment was not based on the evidence. Defendant argues that interpretation of the Act is at issue, which requires a *de novo* review. We disagree. The resolution of this appeal requires an evaluation of the evidence as it is applied to the Act. This factual determination calls for review under the manifest weight of the evidence standard. *In re Application of the Kane County Collector*, 297 Ill. App. 3d 745, 748 (1998).

¶ 16    The Uniform Fraudulent Transfer Act was enacted to enable a creditor to defeat a debtor's transfer of assets to which the creditor was entitled. 740 ILCS 160/5 (West 2008); see *Rush University Medical Center v. Sessions*, 2012 IL 112906, ¶ 20. The purpose of the Act is to "invalidate otherwise sanctioned transactions made with a fraudulent intent." *In re Marriage of Del Giudice*, 287 Ill. App. 3d 215, 218 (1997). The Act supplements common law principles of "law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause." 740 ILCS 160/11 (West 2008); *Rush University Medical Center*, 2012 IL 112906, ¶ 18.

¶ 17    Under the Act, a transfer is fraudulent as to a creditor if the debtor made the transfer:

> "(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5(a) (West 2008).

A creditor is a person or entity who has a right to repayment, whether or not it has been reduced to judgment. 740 ILCS 160/2(c), (d) (West 2008). The test to determine whether a transfer is valid under the Act is whether the transfer "directly tended to or did impair the rights of creditors." (Internal quotation marks omitted.) *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193 (2010). Under the Act, "[a] donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent." (Internal quotation marks omitted.) *Id.* at 193-94.

¶ 18    Illinois recognizes two categories of fraudulent transfers: "fraud in law" and "fraud in fact," which are distinguished by "whether the transfer was supported by consideration." *Reagan v. Baird*, 140 Ill. App. 3d 58, 64-65 (1985). A "fraud in law" transfer is where a transfer is "made for no or inadequate consideration," the "fraud is presumed" (*Anderson v. Ferris*, 128 Ill. App. 3d 149, 153 (1984)) and the intent of the parties to the transaction is immaterial (*Gary-Wheaton Bank v. Meyer*, 130 Ill. App. 3d 87, 94 (1984)). Conversely, where "actual consideration has been given for the transfer and a specific intent to defraud" has been proven, the transfer constitutes "fraud in fact." *Anderson*, 128 Ill. App. 3d at 153. Here, Tierney stipulated she had no investment in BlackRock and no interest in Randolph Equities and the trial court stated that it did not find Adam's uncorroborated testimony that he loaned monies to Randolph Equities credible and found that the BlackRock settlement transfers to the defendants were presumed fraudulent and the presumption of fraud was not rebutted.

¶ 19    Adam first argues that the trial court "bypassed" a "fraud in law" analysis and "moved directly" to a "fraud in fact" analysis, suggesting that the trial court was obligated to consider both types of claims. Plaintiff brought a claim seeking imposition of a constructive trust over a fraudulent transfer under both "fraud in law" and "fraud in fact" theories. Contrary to defendant's argument, the trial court was not required to conduct a "fraud in law" analysis before it analyzed the claim under a "fraud in fact" analysis. See *First Security Bank of Glendale Heights v. Bawoll*, 120 Ill. App. 3d 787, 792-93 (1983) (when a transfer constitutes

"fraud in law," the court need not consider in the alternative whether the transfer constitutes "fraud in fact"). Therefore, because the trial court found a presumption of fraud based on the circumstances surrounding a debtor's substantial asset transfer that directly impaired the rights of a creditor, the trial court was not required to declare whether the transfer was "fraud in fact" or "fraud in law."

¶ 20    Second, Adam argues that the circuit court misapplied section 5 of the Act (740 ILCS 160/5 (West 2008)) when it failed to consider all 11 factors indicating fraud when finding a presumption of fraud under "fraud in fact" analysis. As a threshold matter, Adam's brief on this issue fails to comply with the requirements set forth by Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). Rule 341 governs the procedure concerning appellate briefs. Supreme court rules are not suggestions, but rather, they are mandatory and must be followed. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8; *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). It is well established that "[r]eviewing courts are entitled to have the issues clearly defined, to be cited pertinent authorities and are not a depository in which an appellant is to dump *** argument and research as it were, upon the court" (*In re Estate of Kunz*, 7 Ill. App. 3d 760, 763 (1972)) and failure to cite to authority may result in forfeiture of the issue on appeal. *Soter v. Christoforacos*, 53 Ill. App. 2d 133, 137 (1964).

¶ 21    Adam does not provide any support for his argument that the circuit court is required to consider all 11 factors of fraud before it can determine intent to defraud. However, "waiver is an admonition to the parties, not a limitation upon the powers of [the] courts of review." *Matthews v. Chicago Transit Authority*, 2014 IL App (1st) 123348, ¶ 80. We have the discretion to review the merits of Adam's first argument in the interest of judicial economy and where, as here, the necessary facts to understand Adam's argument are simple. *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292-93 (1991). On this basis, we exercise our authority to review this appeal.

¶ 22    To prevail on a claim for "fraud in fact," a plaintiff "must prove that the transfers were made with the actual intent to hinder, delay, or defraud the creditors." *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193. The Act lists 11 factors that may be considered in determining fraudulent intent. Section 5(b) of the Act provides:

"In determining actual intent under paragraph (1) of subsection (a) [actual intent to hinder, delay, or defraud any creditor of the debtor], *consideration may be given, among other factors, to whether*:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." (Emphasis added.) 740 ILCS 160/5 (West 2008).

¶ 23 Clearly, the Act does not require the trier of fact to consider all 11 factors. Rather, the statute provides that "[i]n determining actual intent *** consideration *may* be given, among other factors" (emphasis added). *Id*. The plain meaning of the Act does not require a court to consider all 11 factors. 740 ILCS 160/5(b) (West 2008); *Falcon v. Thomas*, 258 Ill. App. 3d 900, 911 (1994) (the 11 factors of fraud "*may* be considered in determining the debtor's actual intent" (emphasis added)); see *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996) (interpreting the factors of fraud as mere considerations); *In re Schneider*, 417 B.R. 907, 915 (Bankr. N.D. Ill. 2009) (referring to factors of fraud as " 'symptoms of fraud' " that may be considered (quoting *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005))). Illinois law is clear that when the factors of fraud "are present in sufficient number, it may give rise to an inference or presumption of fraud." *Steel Co.*, 278 Ill. App. 3d at 251 (finding of four factors was sufficient to establish presumption of fraud); see *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193 (finding of six factors was sufficient to establish presumption of fraud); *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005) (reversing trial court's holding that five factors was insufficient to establish a presumption of fraud and suggesting that even a finding of one factor may be sufficient). In this case, the trial court considered nine factors of fraud and ultimately determined that seven factors weighed in favor of a presumption of fraud. We find the trial court did not err in considering only 9 of the 11 factors of fraud in determining whether Adam acted with intent to hinder, delay, or defraud Northwestern.

¶ 24 Third, Adam argues that the trial court's finding of a presumption of fraud was against the manifest weight of the evidence. Adam argues that the trial court erred in finding a presumption of fraud because it failed to give sufficient weight to his "uncontroverted" evidence that: (1) he did not receive notice of the back-rent lawsuit until April or May of 2010, after the BlackRock settlement had been dispersed; and (2) he previously loaned Randolph Equities $10 million and was entitled to a preferential repayment.

¶ 25 The standard of review of a trial court's judgment after a bench trial is whether that judgment is against the manifest weight of the evidence. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004). A judgment is against the manifest weight of the evidence when it appears from the record that the judgment is arbitrary, unreasonable, not based on evidence, or the opposite conclusion is apparent. *Munson v. Rinke*, 395 Ill. App. 3d 789, 795 (2009). We will not disturb a trial court's judgment as long as there is evidence to support the judgment. *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 256 (1992). "[W]e may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009).

¶ 26 Adam asserts that the trial court's finding of a presumption of fraud was "directly contradicted by the only evidence in the record," and in support cites exclusively to his own testimony. Adam largely argues "facts" that he believes the trial court failed to weigh in his favor or accept as true. Adam completely ignores the well-established legal principal that the trier of fact, in this case an experienced trial judge, is free to accept or reject testimony and give whatever weight it deems appropriate to the evidence submitted. Under a manifest weight of the evidence review, we give the trial court's decision great deference because "[t]he trial court is in a far better position to determine the credibility of witnesses." *First Security Bank of Glendale Heights v. Bawoll*, 120 Ill. App. 3d 787, 794 (1983); *Falcon v. Thomas*, 258 Ill. App. 3d 900, 909 (1994). A reviewing court will not substitute its judgment for that of the fact finder "on matters of credibility of a witness, weight of evidence and the inferences drawn from the evidence" unless the opposite conclusion is evident from the record. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 21.

¶ 27 After considering all the evidence, including Adam's testimony, the trial court determined that seven factors of fraud evidenced Adam's intent to defraud plaintiff. The court found, with more than ample justification, there was a presumption of fraud because Adam was on notice of the debt Randolph Equities owed to plaintiff and the subsequent transfer of the settlement funds to himself and his ex-wife to the total exclusion of Randolph Equities, the only contract purchaser of the Florida real estate involved in the BlackRock litigation. We affirm, finding that the trial court's judgment was not against the manifest weight of the evidence.

¶ 28 Adam contends that he only became aware of plaintiff's back-rent lawsuit sometime in March or April of 2010, after the BlackRock settlement agreement. Adam asserts that he could not have had intent to defraud if he never had notice of a debt to Northwestern. The trial court rejected Adam's assertions and determined that Adam, as president, CEO, COO and sole manager, had notice of the back-rent suit, or at least notice of a threat of suit, prior to the BlackRock settlement. The lease, executed by Adam on behalf of Randolph Equities, called for notice to be sent to Adam. Certified demand letters were sent to Adam, Randolph Equities' Chicago attorneys and its registered agent several months before the BlackRock settlement. The trial court "accepted Mr. Sharif's contention that he didn't get a copy of the summons or complaint until March [2010]" but found that the two certified letters "indicate that he had to have–understood or received notice that this was a debt" and there was "ample notice that this lawsuit was coming. You don't walk away from a commercial lease for numbers of $200,000 without someone making an attempt to collect. And there's two letters that went to him, plus a lawsuit."

¶ 29 Under the Act, a creditor must show that it has a " 'right to payment' that it can seek to recover from the debtor. *** [W]hether or not the right is reduced to judgment ***." (Internal quotation marks omitted.) *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 186-87; 740 ILCS 160/2(c) (West 2008). Given Adam's self-proclaimed success in the complex field of mortgage financing and his status as manager, CEO, COO and president of the debtor, there is no plausible argument that the trial court was incorrect. Therefore, we find that the trial court did not err in finding that plaintiff had a right to payment of the unpaid rent and Adam was on notice of this claim prior to the BlackRock settlement payout.

¶ 30 Adam argues that the trial court "fail[ed] to address the fact that Adam is a creditor of Randolph Equities" and he established through his testimony that he loaned Randolph Equities $10 million and, therefore, there was adequate consideration for the transfer of the BlackRock

settlement proceeds to himself, negating any presumption of fraud. He maintains the corporation was free to favor him as a creditor over plaintiff. Adam asserts that plaintiff did not controvert his testimony and therefore, it must be taken as true.

¶ 31    In determining the validity of a transfer under the Act, the test is whether the transfer "directly tended to or did impair the rights of [the] creditors." (Internal quotation marks omitted.) *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193-94. "A donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent." (Internal quotation marks omitted.) *Id*. The burden of dispelling an implication of fraud for the transfer is on the debtor and the donee of the transfer. *Harris v. Aimco, Inc.*, 66 Ill. App. 3d 60, 63 (1978). It is a correct statement that a debtor may prefer one creditor over another as long as he acts without fraudulent intent. "A debtor has a right to prefer one creditor when he acts without fraud, even though he devotes all his property to the preferred creditor, leaving nothing to which his other creditors can resort. There must be evidence to show a fraudulent intent before a conveyance made upon a valuable consideration may be held fraudulent." *Snow v. Hogan*, 312 Ill. App. 636, 644 (1942); *Zwick v. Catavenis*, 331 Ill. 240, 247 (1928); *Harris v. Aimco, Inc.*, 66 Ill. App. 3d 60, 63 (1978). In the instant case, the weight of the evidence supports the trial court's finding that routing the BlackRock settlement proceeds directly to Adam and his ex-wife and not to Randolph Equities, the plaintiff/contract purchaser of the failed real estate transaction underlying the BlackRock litigation, was fraudulent. The parties agree that Adam was an insider of Randolph Equities due to his status as its manager, CEO, COO and president and that Randolph Equities was insolvent before the settlement and at the time the bulk of the proceeds were transferred directly to Adam instead of Randolph Equities. Even if there had been credible evidence of consideration for the transfer, which the trial court totally dismissed, and Adam had been an actual creditor of Randolph Equities, because the transfers to Adam and Tierney effectively depleted all assets of the insolvent debtor, the transfers were fraudulent because they hindered the rights of the plaintiff to collect the debt owed. *Id*.

¶ 32    Contrary to Adam's argument, the trial court did consider Adam's testimony that he "loaned" Randolph Equities its operating capital. This testimony was considered and rejected. Adam testified that he loaned Randolph Equities $10 million over the course of 10 years and, therefore, adequate consideration existed for the transfer of the BlackRock funds to himself. Adam had the burden to prove the transfer was not fraudulent in light of the substantial evidence that Randolph Equities was insolvent and stopped paying its rent, he was the manager, president, CEO and COO of the debtor, he had been sent a demand notice from plaintiff, he authorized the BlackRock settlement funds to be paid directly to himself and his former wife effectively eliminating any paper trail showing money going directly to Randolph Equities, a named plaintiff in the BlackRock litigation. According to Adam, he amassed his fortune working as the managing director of a commercial mortgage company and served on that company's senior management committee. He founded Randolph Equities, an investment firm, and allegedly loaned the firm $10 million of his personal funds, and repaid himself part of the loan in preference over Randolph Equities' other creditors. His testimony alone did not carry the day.

¶ 33    Admitting that his business records were with his accountant in Chicago, Adam failed to present objective, unbiased testimonial or documentary evidence, *e.g*., cancelled checks, bank transfers, loan agreements, to support the position that these transfers to himself were credible

loan repayments to a *bona fide* creditor. A fair review of the record establishes that Adam was a Randolph Equities insider who transferred substantially all of its valuable assets, the BlackRock settlement funds, from Randolph Equities to himself, in a manner designed to conceal the assets from a known creditor at a time when he knew of the threatened suit and under circumstances he knew would render the debtor insolvent.

¶ 34 The record reveals that plaintiff requested production of any documents evidencing that the $10 million given to Randolph Equities was in fact a loan. Tellingly, Adam did not produce these documents. Instead, Adam told the plaintiff it could inspect his files at his accountant's Chicago office. However, because the documents were allegedly in the possession of Adam's accountant, Adam had constructive possession of these documents and had the authority and ability to produce them as evidence in his defense. See *Franzen v. Dunbar Builders Corp.*, 132 Ill. App. 2d 701, 709 (1971); *Hawkins v. Wiggins*, 92 Ill. App. 3d 278, 282 (1980). Because the court correctly found that "there's really no documentary evidence there whatsoever to corroborate that [Adam loaned Randolph Equities $10 million]," the trial court found that Adam's testimony failed to establish consideration for the transfer of Randolph Equities' assets to himself, causing Randolph Equities to become insolvent and unable to satisfy Northwestern's claim. A presumption of fraud was clearly established and clearly not rebutted.

¶ 35 Where the trial court finds a presumption of fraud has been established, "the burden of dispelling the presumption of fraud and showing that actual consideration was given for the transaction is upon the debtor or the person to whom the property was conveyed." *Harris*, 66 Ill. App. 3d at 62. Here the circuit court also explained that "[r]eally, Randolph [Equities] got nothing" although it was named on all the relevant documents at issue in the BlackRock litigation and Adam could not "throw" the corporation's name "loosely on documents and then decide which way you want to go; when something bad happens, you put on the LLC, and when something good happens, you take it yourself. That's not the way it works." The trial court correctly concluded that there was no credible evidence presented by Adam that he had a valid claim to the debtor's assets when he orchestrated the disbursement of the settlement to effectively conceal assets of the debtor from a creditor with a valid claim to those assets. As a reviewing court, we do not substitute our judgment for that of the circuit court because it was in a better position to observe Adam's testimony and assess his credibility. *Falcon*, 258 Ill. App. 3d at 909.

¶ 36 Therefore, we find that the evidence clearly supports the judgment of the trial court that Adam fraudulently transferred proceeds of the BlackRock settlement in contravention of the Act. We also find the trial court properly applied the Act and the trial court's judgment was not against the manifest weight of the evidence.

¶ 37                                   CONCLUSION

¶ 38 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39 Affirmed.