2021 IL App (1st) 200733-U

SIXTH DIVISION
June 11, 2021

No. 1-20-0733

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| JOHN P. REIDY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 2379 |
| | ) | |
| ELLEN JORDAN REIDY, | ) | The Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's grant of summary judgment in favor of defendant is affirmed. No genuine issue of material fact exists.

¶ 2     Plaintiff John P. Reidy appeals from the circuit court's grant of summary judgment in favor of defendant Ellen Jordan Reidy on John's second amended complaint, in which he alleged that the parties' estate planning was fraudulent under the common law and the Uniform Fraudulent Transfer Act (Act) (740 ILCS 160/1 *et seq.* (West 2016)). On appeal, John argues that (1) summary judgment in favor of Ellen was based on inadmissible hearsay and documents that were not properly authenticated and (2) the court erred in granting summary judgment because there was a

genuine question of fact as to whether the estate planning was fraudulent. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Trusts

¶ 5     This case stems from the Reidys' 2012 transfer of assets into two specific trusts. The first was a transfer of Ellen's business interests into the Ellen Jordan Reidy 2012 Grantor Retained Annuity Trust (GRAT). The second was the transfer of a condominium into the John P. Reidy 2012 Qualified Personal Residence Trust (QPRT).

¶ 6     Robert Hamilton, the estate planning attorney who set up the trusts for the Reidys, explained, in a deposition taken in the Reidys' dissolution of marriage case, that a GRAT is an "irrevocable trust that is designed to operate as an estate freeze for certain assets," and an estate freeze "is an estate planning transaction where you keep essentially the present value of what you put in the trust, plus what we sometimes call a hurdle [interest] rate." "You then attempt to give away whatever future growth there may be on the asset" and "[y]ou retain an annuity."

¶ 7     A QPRT, Mr. Hamilton explained,

> "is kind of a counterpart of the GRAT. You create an irrevocable trust, and you transfer property into the trust. In this case it has to be a personal residence. You retain the right to live in the residence for a period of years. Same way a GRAT would retain an annuity for a period of years. And then at the end of the *** QPRT term, you no longer have a right to live there. If you want to continue to live there, you have to pay rent, and the property is now owned by the remainder beneficiaries."

¶ 8     John alleged in his complaint that Ellen "decided to separate from John" in 2008 or 2009 and thereafter "she unilaterally commenced a scheme (which was unbeknownst to John) to divest

John of his interest in the parties' marital estate." John alleged that the "true purpose" of the tax planning they had done prior to their divorce, which was not revealed to him, "was to devise a scheme to transfer assets out of Ellen and John's marital estate under the guise of estate and tax planning, thereby inequitably securing more assets to Ellen."

¶ 9    The following undisputed facts were before the court on Ellen's motion for summary judgment. John and Ellen were married in April 1986. They had three children during their marriage, all of whom were, by the time of their divorce, emancipated adults. Ellen is the owner and chief executive officer of America's Food Technologies, Inc. (Amfotek), a custom beverage developer and manufacturer, which operates from an approximately 101,000-square-foot building located in Tinley Park, Illinois. That property is owned by Mariah Partners, LLC (Mariah). Mariah rents the Tinley Park property to Amfotek. John was a teacher with the Chicago Public Schools until he retired in 2006.

¶ 10    John and Ellen owned both a condominium in Naples, Florida, which they bought in September 2006 for $2.15 million, and a residence in Palos Park, Illinois. Since at least 2009 or 2010, John resided at the Naples condo six to seven months of the year and at the couple's Palos Park residence the rest of the year.

¶ 11    On April 1, 2011, Ellen flew to Florida for the weekend, stayed at the Naples condo with John, and, according to John's deposition, informed him that she wanted a divorce, but explained that they needed a two-year separation period before divorce proceedings could be initiated. On April 5, 2011, John e-mailed Ellen, letting her know that he was opposed to a divorce.

¶ 12    In January or February 2012, the parties' personal accountant, Phillip Salvador, contacted Ellen about "the current environment of estate and gift tax law and its uncertain future after December 31, 2012," and advised Ellen that it would be a good time to "consider what they might

want to do in terms of estate planning in light of the same." Mr. Salvador confirmed that he was the one who initiated this contact with Ellen.

¶ 13    Ellen testified in her deposition that she had "several" conversations with John regarding Mr. Salvador's advice, and that John agreed that they should move forward with the estate planning. John acknowledged in his own deposition that Ellen initiated these estate planning conversations with him in 2012, explaining to him that a tax law would expire at the end of the year and transferring the Naples condo to their daughters before then would be "would be a good advantageous tax position to take." John also said in his deposition that "[f]rom what she said it sounded like a good idea."

¶ 14    On February 9, 2012, Mr. Salvador referred Ellen to Wendy Crawford-Schultz, a certified public accountant specializing in business valuations, for a valuation of Ellen's interests in Amfotek and Mariah. Ellen officially engaged Ms. Crawford-Schultz on September 14, 2012.

¶ 15    On September 24, 2012, Ms. Crawford-Schultz e-mailed Ellen about the optimal valuation date for her business valuations. Ms. Crawford-Schultz then added, "I also wanted to see if your divorce is final. Only to make sure that if there was a value assigned to your interests in the divorce, we don't have conflicting information around the same time frame. It may be prudent to use a valuation date after the date of divorce." Ellen responded to this e-mail the following day, saying, "I never filed for divorce and would like to talk about that as well as the updated valuation date and issues with the business this year." John claims that he was unaware of this exchange until he learned of it in discovery in the dissolution proceeding.

¶ 16    On September 27, 2012, Ellen e-mailed Mr. Salvador to schedule a meeting with him, Ms. Crawford-Schultz, and an estate planning attorney. In that e-mail, Ellen said, "[o]nce we choose a date I'll let John know so he can participate and be informed about the process and decisions."

Again, John claims he did not know of these communications.

¶ 17    Ms. Crawford-Schultz conducted site visits for her valuation of the businesses on October 5, 2012. She e-mailed the draft valuation report for Mariah to Ellen and Mr. Salvador on October 17, 2012, and the draft valuation report for Amfotek on October 26, 2012. John claims he did not have knowledge of these documents until he obtained them in discovery in the dissolution case.

¶ 18    On November 1, 2012, Ellen and John met with Mr. Salvador. Mr. Salvador recalled that they discussed the concepts of an QPRT and a GRAT. According to Ellen, the three also discussed the Reidys' assets and cash flow requirements for estate-planning purposes. John acknowledged during the divorce proceedings that, in that meeting, they also reviewed a preliminary balance sheet that Mr. Salvador had prepared, on which John took notes about the QPRT and the estimated value of Amfotek for purposes of including it in a GRAT. After the meeting, Ellen e-mailed Mr. Salvador—copying John—to thank him for meeting with them and to discuss when they might meet again.

¶ 19    Following that initial meeting, John scheduled an appointment for a real estate appraiser to appraise the Reidys' Naples condo to get, in his words, "a lowball or highball figure, depending on what would have been advantageous" to him and Ellen. John testified in his deposition that he made the appraisal appointment voluntarily. He also wrote the check for the appraisal. John said that his understanding was that the value of the condo was needed to fill out documents for "[t]he trust that [it] was going into, the QPRT or whatever it was." John explained his understanding of the QPRT at that time as a gift to their children—a way he and Ellen "could pass on the condominium to save on taxes, and it had to be done within that year because the law expired at the end of that year." John said that he was fine that his children would be the beneficiaries of the QPRT because he loved them.

¶ 20    The written appraisal, which was completed on November 13, 2012, stated that its purpose was to "[e]stimate market value to assist in estate planning," the client was "Mr. John Reidy," and the intended users were "Mr. & Mrs. John P. Reidy."

¶ 21    On December 16, 2012, Ellen e-mailed Robert Hamilton, the estate planning attorney, and copied John, stating that John was "in agreement with the term of the QPRT for Naples being 10 years." Ellen also said in that e-mail that John "had a question about whether it was better to have one daughter named as Trustee or to have all three named jointly?"

¶ 22    In a December 18, 2012, e-mail, Mr. Hamilton indicated to Ellen that he would e-mail her drafts of the GRAT and the QPRT that day and asked for John's e-mail address to send him a copy of the QPRT also. Ellen responded, again copying John, so that Mr. Hamilton would have John's e-mail address.

¶ 23    On December 19, 2012, Mr. Hamilton e-mailed John, copying Ellen and Mr. Salvador, with drafts of the QPRT and the warranty deed for the Naples condo. In the e-mail, Mr. Hamilton explained the terms of the QPRT in great detail, including the following: John was making a gift of the Naples condo but would retain the right to live there for 10 years; he and Ellen had discussed the idea of a 10-year QPRT and John "would like to proceed along those lines"; if John was still living at the end of the 10-year term, the house would remain in trust and the only beneficiaries of the trust would be Ellen and their children; Mr. Hamilton had structured the trust to be a grantor trust because that is how he usually advises clients, but he could structure it otherwise if John preferred; and the goal was to have the trust signed and the deed recorded before the end of the year. Mr. Hamilton's e-mail specifically stated: "Ellen remains a beneficiary even if you should become divorced or separated." He concluded the e-mail by saying, "please look this over and let me know if you have questions or changes." At his deposition, John acknowledged that he had

received and read the e-mail.

¶ 24    An e-mail from Mr. Hamilton to Ellen, dated December 20, 2012, indicates that John, through Ellen, had also inquired about the "Special Powerholder" provisions in the QPRT. Mr. Hamilton responded that he was "happy to speak to [Ellen] and John about the e-mail." The following day, Mr. Hamilton e-mailed Ellen with a revised QPRT, indicating that he had removed the special powerholder provision and removed Ellen as a person who could become a successor trustee.

¶ 25    On December 24, 2012, John executed the QPRT and the warranty deed for the Naples condo, returning the originals to Mr. Hamilton's office. John testified in his deposition that when he signs legal documents, "[b]ecause I generally don't understand them, I don't waste my time reading them. They're filled with language that I'd have to spend too much time to understand them."

¶ 26    John also testified that when he received the draft QPRT, he "skimmed through it." He did not contact a lawyer to review the document, and agreed that no one restricted or prohibited him from doing so. He testified that he discussed the QPRT with Ellen and that it had always been his plan to leave the Naples condo to their children.

¶ 27    On January 31, 2013, Mr. Hamilton sent to the Reidys' Palos Park residence a cover letter again explaining the overall terms of the GRAT and QPRT. According to the cover letter, also enclosed were two booklets, one with the final GRAT documentation, and the other with the final QPRT documentation. Mr. Hamilton also sent a copy of the cover letter, without the enclosures, to John in Florida.

¶ 28    In an affidavit attached to his summary judgment response, John stated that he did not see the GRAT until after Ellen filed for divorce. The GRAT documents show that Ellen placed her

39% membership interest in Mariah and 150 shares of Amfotek stock in that trust.

¶ 29                              B. The Dissolution Proceedings

¶ 30    In September 2013, Ellen petitioned to dissolve her marriage to John (case No. 13 D 8084). On December 20, 2016, the dissolution judgment in case No. 13 D 8084 was entered by the domestic relations division of the circuit court. The court found, in part, that there was a "distinct disparity in the financial contributions of the parties," and specifically that "Ellen's financial contributions to the marriage ha[d] been far superior to John's financial contributions." The court also found that each party was "economically self-sufficient." John was awarded 50% of the marital estate (approximately $3.69 million) and 45% of the marital business interests (approximately $3.77 million), totaling just over $7.4 million. John appealed from that judgment, raising among other issues the claim that the circuit court had failed to classify the corpus of the QPRT and GRAT as marital property. On July 31, 2018, this court affirmed the dissolution judgment in its entirety, recognizing that John's claims regarding the QRPT and GRAT were not before the court at that time but were, instead, part of the separate action in the law division that is currently before the court on this appeal. See *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶¶ 26-32.

¶ 31                              C. The Present Appeal

¶ 32    John first filed his complaint in the law division on March 4, 2016, while the dissolution proceedings were pending. John filed the operative complaint on April 16, 2018, asserting claims against Ellen for common law fraud (count I) and fraudulent conveyance in violation of the Uniform Fraudulent Transfer Act (Act) (740 ILCS 160/1 *et seq.*) (count II). Specifically, John alleged that the asset transfers into the QPRT and the GRAT were fraudulent because Ellen used the transfers to remove assets from the marital estate so that John would not be entitled to any part

of them in the divorce proceeding.

¶ 33    On November 5, 2019, Ellen filed her verified motion for summary judgment. In support of her motion, Ellen attached many documents, including transcripts of depositions taken in the dissolution case, e-mail correspondence between Ellen and/or John and Mr. Salvador, Ms. Crawford-Schultz, and Mr. Hamilton, and the QPRT executed by John. Ellen also attached an expert report from the dissolution case completed by Lauren J. Wolven, a partner in the Trusts and Estates Group at Levenfeld Pearlstein, LLC. This report confirmed the uncertainty in estate planning in 2012 due to a reduction of the "then historically high" per-person federal estate tax exemption from $5.12 million to $1 million scheduled to take effect on January 1, 2013. Ms. Wolven analyzed the Reidys' 2012 estate planning and the value of their interests in the QPRT and the GRAT, and concluded that this gifting was "not aggressive or unusual," "was appropriate and standard given [their] net worth, their relative ages, and the tax environment in 2012," and was consistent with the Reidys' desired outcome of passing their assets to their children. Ms. Wolven also stated in her report:

> "These transactions are both a leveraged gift of appreciation with a retained interest by the donor, and at their core are almost identical transactions that look different because of the type of property used to fund the trust. Both transactions benefit the Reidys' mutual children and not John or Ellen, because planning to reduce estate taxes by its nature typically will not have its benefit realized until the survivor of the couple doing the planning is deceased."

¶ 34    On February 5, 2020, John filed his response to Ellen's motion for summary judgment, arguing that he had demonstrated material issues of fact as to whether Ellen committed common law fraud with respect to the QPRT and the GRAT. In support of his response, John attached

several documents, including additional transcripts of depositions taken in the dissolution proceeding, the GRAT documents, and the September 2012 e-mail exchange between Ellen and Ms. Crawford-Schultz.

¶ 35　In an eight-page written order entered on May 6, 2020, the circuit court granted Ellen's motion for summary judgment. The court noted that, although the assets placed into the QRPT and GRAT would otherwise have been "marital property," a transfer of such property into a trust is valid even where the transfer is for " 'the precise purpose of minimizing or defeating the statutory marital interests of the spouse in property conveyed,' " provided that the parties possessed donative intent to make a complete conveyance (quoting *Johnson v. La Grange State Bank,* 73 Ill. 2d 342, 357 (1978)). The circuit court found that Ellen was entitled to summary judgment on count I because it was clear "that not only was John completely aware of the estate planning in 2012, but he actively participated in the planning and was copied on various communications regarding the GRAT both prior to and after its execution." The court granted summary judgment on count II because John failed to show that he was a creditor of Ellen's, which was a necessary element of a claim under the Act.

¶ 36　This appeal followed.

¶ 37　　　　　　　　　　　　II. JURISDICTION

¶ 38　The circuit court granted summary judgment on May 6, 2020, and John timely filed his notice of appeal on May 29, 2020. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 39　　　　　　　　　　　　III. ANALYSIS

¶ 40　Both parties in this case waste an unfortunate amount of the court's time as well as their

own time throwing barbs at each other, rather than addressing the issues on appeal. Each insists that portions of the other's brief should be stricken for violating Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). It is true that "[s]upreme court rules are not advisory suggestions, but rules to be followed." *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. But "[t]he striking of an appellate brief, in whole or in part, is a harsh sanction and is appropriate only when the alleged violations of procedural rules interfere with or preclude review." (Internal quotation marks omitted.) *In re County Treasurer and ex Officio County Locator*, 373 Ill. App. 3d 679, 683 (2007). Because both parties' briefs ultimately address the issues to be considered on appeal, we elect to disregard any improper arguments and decline to strike any portion of the briefs.

¶ 41    John also argues that, in the circuit court, Ellen violated Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013) by not including an affidavit of a person with personal knowledge for each exhibit she attached to her motion for summary judgment. The documents John specifically takes issue with include (1) the e-mail correspondences between Ellen and John, Mr. Salvador, Mr. Hamilton, or Ms. Crawford-Schultz, (2) invoices from the Bluewater Consulting Group, LLC, and Mulcahy, Puaritsch, Salvador & Co., (3) the balance sheet and handwritten notes from the November 1, 2012, meeting between John, Ellen, and Mr. Salvador, (4) the Naples condo appraisal, and (5) the cover letter Mr. Hamilton sent to Ellen, copying John, with the trust documentation. John argues that these documents were improperly admitted as hearsay and were not properly authenticated.

¶ 42    A summary judgment motion can be supported by "pleadings, depositions, and admissions on file," in addition to affidavits. 735 ILCS 5/2-1005(c) (West 2018). Supreme Court Rule 212(a)(4) (eff. Jan. 1, 2011) also specifically allows discovery depositions to be used "for any purpose for which an affidavit may be used." Here, Ellen attached transcripts of the depositions of

herself, John, and Mr. Salvador, taken in the dissolution proceedings as well as portions of the trial transcripts from the dissolution proceeding. John, in turn, attached transcripts of the depositions of Mr. Hamilton and Ms. Crawford-Schultz. A review of these transcripts shows that the witnesses authenticated most of the documents that Ellen relies on in her summary judgment motion during their testimony. For example, John testified at the dissolution trial that certain of the handwritten notes on the balance sheet from the November 1, 2012, meeting were made by him.

¶ 43    Ellen also attached authentication certifications for business records requested by John in discovery for the dissolution case from Mr. Salvador, Mr. Hamilton, and Ms. Crawford-Schultz. These certifications each state that the records "were made in the regular course of business," that the individual executing them was the "custodian" of the records, and that all statements made in the certification were true. See Ill. S. Ct. R. 236 (eff. Aug. 1, 1992) (titled "Admission of Business Records in Evidence"); Ill. R. Evid. 803(6) (eff. Sept. 28, 2018) (recognizing "Records of Regularly Conducted Activity" as a hearsay exception); and Ill. R. Evid. 902(11) (eff. Sept. 28, 2018) (recognizing "Certified Records of Regularly Conducted Activity" as self-authenticating).

¶ 44    Between the authentications in the depositions and the authentications attached to document productions, it is clear, to us, that the documents attached to Ellen's motion for summary judgment on which we rely and on which the circuit court relied were properly authenticated and her motion was properly supported. We therefore turn to the merits of the circuit court's summary judgment ruling.

¶ 45    "Summary judgment is proper when 'the pleadings, depositions, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20 (quoting 735 ILCS 5/2-1005(c) (West 2012)). "The purpose of summary judgment

is not to try an issue of fact but to determine whether one exists." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Id.* In ruling on a motion for summary judgment, we must construe the pleadings and evidence strictly against the movant and liberally in favor of the opponent. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22. We review a circuit court's ruling on a motion for summary judgment *de novo. Id.*

¶ 46                                    A. Common Law Fraud (Count I)

¶ 47     In count I of his complaint, John alleged common law fraud. "A high standard of specificity is imposed on pleadings asserting fraud." *Chatham Surgicore, Ltd. v. Health Care Service Corp.*, 356 Ill. App. 3d 795, 803 (2005). Our supreme court has recognized that the transfer of marital property into a trust is vulnerable to attack where "the transaction is a sham and is 'colorable' or 'illusory' and is tantamount to fraud." *Johnson*, 73 Ill. 2d at 358. An "illusory" transfer would be "one which takes back all that it gives," while a "colorable" transfer "is one which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor." *Id.* at 359. Our supreme court explained in *Johnson* that an owner of property in Illinois "has an absolute right to dispose of his property during his lifetime in any manner he sees fit," even if "the transfer is for the precise purpose of minimizing or defeating the statutory marital interest of the spouse in the property conveyed." *Id.* at 357. So "[w]here present donative intent exists, the transfer is valid and effective to defeat the marital interest." *In re Estate of Mocny*, 257 Ill. App. 3d 291, 296 (1993).

¶ 48     John argues that he has presented sufficient evidence to raise a question of material fact

regarding whether the property transfers into the QPRT and GRAT were shams. With respect to the QPRT, John claims that, under the guise of estate planning, Ellen "tricked" him into transferring the Naples condo into the QPRT, thereby stripping him of his interest in the condo. John also argues that Ellen did not have true donative intent in creating the GRAT. In support of these arguments, John points out the following facts: he was told it was urgent to have the transfers executed before the end of 2012, due to the risk of the federal estate tax exemption being reduced; he "had no input or part in fashioning the QPRT's terms and provisions"; the final draft of the QPRT gave Ellen an interest in the Naples condo that she did not have previously, while earlier drafts did not; he only saw the final draft; and he was never advised to retain his own counsel or that Ellen's interests might be adverse to his own.

¶ 49    But none of these facts undermine the validity of the transfer of property into these trusts. As our supreme court made clear in *Johnson*, the crucial fact in determining if a transfer was valid is whether the donor had actual donative intent, which can be determined by looking at whether the transfer takes back what it gives and whether the donor retains ownership of the transferred property. *Johnson*, 73 Ill. 2d at 359-60.

¶ 50    The documents attached in support of summary judgment demonstrate that the QPRT and GRAT were not illusory. As to the QPRT, it is clear that John had donative intent with respect to the Naples condo when he executed the QPRT. He said he had always intended to donate the condo to the couple's children and understood that the QPRT would be doing just that. John understood that he was giving ownership of the condo to his children and that he would retain no ownership interest in the condo. There is nothing about the QPRT that is illusory.

¶ 51    It is also clear that Ellen had donative intent as to the GRAT. She transferred 150 shares of her Amfotek stock and 39% of her interest in Mariah to the GRAT, an irrevocable trust, and after

the 8-year term of the GRAT, those business interests passed to the Reidys' children. Although Ellen received an annuity benefit from the GRAT, this provision does not defeat her donative intent. She neither took back what she gave nor retained ownership of the transferred property. Her children still ultimately received the benefit of the trust property. As pointed out by Ms. Wolven, the annuity was simply a retained interest Ellen received for the life of the GRAT, as John's retained interest in the life of the QPRT was a right to reside in the Naples condo for 10 years.

¶ 52    John also claims that Ellen defrauded him into creating the QPRT and hid its true nature and purpose from him. He insists that the transfer at issue was not estate planning but was instead "hidden 'divorce planning.' " To the extent that John is arguing that Ellen fraudulently concealed her desire to divorce him, that is rebutted by John's own testimony that Ellen told him she wanted a divorce in April 2011. His alleged belief that she had given up on her plan to divorce him does not rebut the fact that she had shared her intentions with him.

¶ 53    Although John now takes issue with the fact that Ellen was also a beneficiary of the QPRT and that he retained the right to live in the condo for "only" 10 years, the e-mail exchanges with Mr. Hamilton make clear that John knew about both provisions before he agreed to the transfer. John acknowledged under oath that he read Mr. Hamilton's e-mail. Even if he had not, however, "[a] person may not enter into a transaction with their eyes closed to available information and then charge he has been deceived by another." *Seefeldt v. Milikin National Bank of Decatur*, 154 Ill. App. 3d 715, 719 (1987).

¶ 54    John insists that the September 2012 e-mail exchange between Ellen and Ms. Crawford-Schultz, which he says he did not see until after Ellen filed for divorce, is evidence of Ellen's secret divorce planning. That exchange, however, proves nothing more than that Ellen had mentioned

her contemplation of divorce to Ms. Crawford-Schultz just as she had to John.

¶ 55    Moreover, while Ellen's motivation is not really an issue, it is undisputed that Mr. Salvador, and not Ellen, initiated the estate planning discussions, due to the dramatic changes to estate and gift tax law that he expected to take effect on January 1, 2013. This sense of urgency leading to the creation of the QPRT and GRAT was confirmed by both Mr. Hamilton and Ms. Wolven. While John argues that the trusts did not result in significant estate tax savings, this does not change the fact that various estate planning experts thought that they might.

¶ 56    *In re Marriage of Frederick*, 218 Ill. App. 3d 533 (1991), on which John relies, is inapposite. In that case, this court, relying on the supreme court's analysis in *Johnson*, recognized that even an "ostensibly valid" trust may actually be a "sham transaction" to defraud a spouse's marital rights. *Id.* at 536. The husband in *Frederick* convinced his wife to sign a letter agreeing that property they had just put into a revocable trust would not be marital property. *Id.* at 538-39. The husband misrepresented "the true nature of the letter" to the wife, telling her that it was to protect the trust for the children so that neither one of them could challenge the trust in a divorce. *Id.* at 535, 538-39. In fact, however, the husband, as trustee, could revoke, terminate, or modify the trust at any time. *Id.* at 536. In addition, the husband hid from the wife that he had already consulted a divorce attorney when the trust was created, and he asked her to sign the letter. *Id.* at 537-39. In that case, the court found that the husband had an intent to defraud the wife and that the transfer of land into a trust was "illusory and created to defeat [the wife's] marital rights to the property in a dissolution proceeding." *Id.* at 539.

¶ 57    There are no similar facts in this case. Ellen told John she wanted to file for divorce approximately a year before the estate planning began, Ellen did not possess any powers that were unknown to John, and Ellen did not misrepresent the terms of the trusts.

¶ 58 Because neither the QPRT nor the GRAT was an illusory trust, and John could not show any misrepresentation by Ellen in obtaining his cooperation in creating these trusts, the circuit court properly granted summary judgment on count I in favor of Ellen.

¶ 59                  B. Fraudulent Conveyance Pursuant to the Act (Count II)

¶ 60 In count II of his complaint, John alleged the trusts were fraudulent conveyances in violation of the Act. "The Uniform Fraudulent Transfer Act was enacted to enable a creditor to defeat a debtor's transfer of assets to which the creditor was entitled." (Internal quotation marks omitted.) *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 16. The purpose of the Act is "to invalidate otherwise sanctioned transactions made with fraudulent intent." *Id.*

¶ 61 John invoked section 5 of the Act. To state a claim under that section, a plaintiff must allege the existence of both a creditor/debtor relationship and a claim. 740 ILCS 160/5(a) (West 2016). The Act defines a "creditor" as "a person who has a claim" (*id.* § 2(d)), a "debtor" as "a person who is liable on a claim" (*id.* § 2(f)), and a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" (*id.* § 2(c)).

¶ 62 John has simply failed to identify any facts indicating that he stood as a creditor in relation to Ellen when the transfers at issue here took place. His insistence that such a relationship existed rests solely on his allegation that Ellen committed common law fraud. Having concluded that there was no fraud with respect to either transfer, we must reject this argument.

¶ 63 The circuit court properly granted summary judgment in favor of Ellen as to count II of John's complaint.

¶ 64                          IV. CONCLUSION

¶ 65 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 66    Affirmed.