# Illinois Official Reports

## Appellate Court

***A.G. Cullen Construction, Inc. v. Burnham Partners, LLC*,**
**2015 IL App (1st) 122538**

| | |
|---|---|
| Appellate Court Caption | A.G. CULLEN CONSTRUCTION, INC., Plaintiff-Appellant, v. BURNHAM PARTNERS, LLC, LORI HALPIN, ROBERT HALPIN, and WESTGATE VENTURES, LLC, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-12-2538 |
| Filed<br>Rehearing denied | March 11, 2015<br>April 9, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-13121; the Hon. Vanessa A. Hopkins, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Brian A. Bosch, of Western Springs, and Richard D. Kalson, of Babst Calland Clements & Zomnir, P.C., of Pittsburgh, Pennsylvania, for appellant.<br><br>James R. Cooney and David L. Fuchs, both of Pittsburgh, Pennsylvania, for appellees. |

Panel                        JUSTICE HYMAN delivered the judgment of the court, with opinion.
                             Justices Lavin and Mason concurred in the judgment and opinion.


**OPINION**

¶ 1        Defendant Westgate Ventures, LLC, hired plaintiff A.G. Cullen Construction, Inc., to build a warehouse and distribution facility in Big Beaver, Pennsylvania. (Westgate was primarily owned by defendant Burnham Partners, LLC, which, in turn, was owned by defendant Robert Halpin.) When the project neared completion, Westgate and Cullen had a disagreement and Westgate stopped paying Cullen. This led to Cullen seeking relief through arbitration and obtaining an award of $457,416.37, which it reduced to judgment in Pennsylvania. Before the arbitration award was entered, Burnham, through Robert Halpin, began to wind down Westgate, liquidating all of the company's assets. After paying off a $2.5 million secured construction loan, the majority of Westgate's remaining cash was disbursed to Burnham in the form of a $400,000 development fee and to the Halpins, to repay a loan they made to Westgate, leaving Westgate with no funds to pay the arbitration award. Cullen filed a lawsuit against defendants in the circuit court of Cook County to recover the amount awarded, alleging, among other things, fraudulent conveyance and breach of fiduciary duty.

¶ 2        After a bench trial, the circuit court entered judgment in defendants' favor on all counts and dismissed the complaint. Cullen contends: (i) the trial court abused its discretion by refusing its request for an adverse inference when defendants failed to produce numerous corporate records they claimed had been lost; (ii) defendants violated section 5 of the Uniform Fraudulent Transfer Act (UFTA or Act) (740 ILCS 160/5 (West 2012)) by liquidating all of Westgate's assets before the arbitration hearing; (iii) defendants violated section 18-804 of the Delaware Limited Liability Company Act (Del. Code Ann. tit. 6, § 18-804 (West 2008)) by fraudulently preferring one unsecured creditor over the other; (iv) the trial court erred in refusing to pierce the corporate veil to hold Halpin personally liable for the money Westgate owes to Cullen; and (v) defendants owed Cullen a fiduciary duty once Westgate became insolvent.

¶ 3        We reverse. Defendants violated the UFTA when, in winding down Westgate, they disbursed all of the company's assets to themselves and other unsecured creditors when they knew about their potential liability to Cullen on its arbitration claim. We disagree with the trial court's finding that Burnham was entitled to the $400,000 development fee or that the other transfers were made in good faith in the absence of documentary evidence to support that finding. Under section 8 of the UFTA, a creditor in a case of fraudulent transfer may obtain "avoidance of the transfer or obligation to the extent necessary to satisfy" its claim. 740 ILCS 160/8 (West 2012). Thus, we remand to the trial court to permit Cullen to satisfy its Pennsylvania judgment. Further, because defendants were using Westgate as a shield to avoid personal liability, the corporate veil has been pierced and defendants are personally liable for the judgment amount, plus interest. Lastly, we need not address Cullen's claim under the Delaware Limited Liability Company Act having determined that defendants violated the UFTA by dissipating all of Westgate's assets.

¶ 4                                      BACKGROUND

¶ 5        In 1998, Robert Halpin formed Burnham Partners, LLC, an Illinois limited liability real estate development company. Halpin is the sole member of Burnham. In June 2005, Burnham created Westgate Ventures, LLC, a Delaware limited liability company, to develop a warehouse and distribution facility in Big Beaver, Pennsylvania. The sole members of Westgate were Burnham, which owned a 90% interest, and Felix Fukui, who owned the remaining 10% interest. (Fukui, an architect, was also hired to design the warehouse property; he is not a party.) Westgate was governed by the Westgate Ventures I, LLC, limited liability agreement (LLC agreement). Article IX of the LLC agreement named Burnham as the initial manager of Westgate and listed numerous duties of the manager, including acquisition, ownership, improvement, sale, and lease of company property. Article XI of the LLC agreement required each member to make a capital contribution to Westgate. Burnham never made a capital contribution. Instead, Robert Halpin and his wife, Lori Halpin, borrowed money from Northern Trust Bank and then loaned $175,000 to Westgate. Westgate executed a note in favor of the Halpins, which was payable on the sale of the property.

¶ 6        On July 1, 2005, Westgate and Burnham entered into a development and asset management agreement (development agreement) in which Burnham agreed to provide development services to Westgate, including purchasing land, hiring an architect, engineers, and contractors, overseeing construction of the building, finding a tenant, and ultimately, selling the building. Robert Halpin drafted the development agreement, represented both Westgate and Burnham in negotiating its terms, and signed the development agreement on behalf of both parties. The development agreement provided that the duties of the project manager, Burnham, would be performed and supervised by Robert Halpin and that Westgate would pay Burnham a development management fee of $400,000.

¶ 7        Westgate hired A.G. Cullen, Inc., a Pennsylvania construction company, as its building contractor. On November 17, 2005, Westgate entered into a standard construction contract with Cullen. Halpin signed the contract on behalf of Westgate, as its managing partner. The construction contract required Cullen to submit to the architect, Fukui, monthly applications for payment. Once Fukui approved payment, Westgate's lender, S&T Bank, would remit a check to Cullen. In April 2006, a dispute arose when Westgate, through Fukui, refused to approve Cullen's request for payment of about $360,000. In June of that year, Cullen filed a demand for arbitration. A hearing took place in July 2007, and on September 7, 2007, the arbitrator entered an award in favor of Cullen and against Westgate. The award included $360,790.38 in unpaid contract work, $9,284.71 for extra work, $37,021.15 in attorney fees, $3,000 in arbitration costs, and $89,990.13 for interest and penalties under the Pennsylvania Contractor and Subcontractor Payment Act (73 Pa. Cons. Stat. Ann. § 501 *et seq.* (West 2008)). The arbitrator deducted $45,000 for liquidated damages and $3,680 for unperformed work under the contract, for a total award of $448,406.87. On November 27, 2007, the court of common pleas of Allegheny County, Pennsylvania, reduced the award to a judgment.

¶ 8        On April 5, 2007, three months before the July 2007 arbitration hearing, Westgate sold the warehouse facility for $3.2 million. After the sale, Westgate engaged in no further business and Halpin began to wind up Westgate and liquidate its assets. From the proceeds of the sale Halpin paid $2,513,984.01 to S&T Bank, a secured creditor. With the remaining $686,015.99, Halpin disbursed to Northern Trust $120,000, the remaining balance on the $175,000 loan the Halpins made to Westgate; paid Burnham's development fee of $400,000,

which was later transferred to Halpin; and gave an additional $70,000 to himself and his wife. Westgate was left with a remaining balance of $27,530.44, which Halpin transferred to himself on July 15, 2007, leaving Westgate with a zero balance in its operating account. Thus, when the Pennsylvania court entered the $457,416.37 judgment in favor of Cullen, Westgate had no remaining assets with which to pay the judgment.

¶ 9 On November 24, 2008, Cullen filed a complaint against defendants in the circuit court of Cook County to recover the amount owed by Westgate on the Pennsylvania judgment. Cullen's third amended, six-count complaint filed on December 5, 2011, alleged breach of fiduciary duty (count I), breach of section 18-804 of the Delaware Limited Liability Company Act (Del. Code Ann. tit. 6, § 18-804 (West 2008)) (count II), and violation of the Pennsylvania Contractor and Subcontractor Payment Act (73 Pa. Cons. Stat. Ann. § 501 *et seq.* (West 2008)) (count III), fraudulent conveyance against Westgate, Burnham, and the Halpins (count V), and against Westgate and the Halpins (count VI). Cullen also sought to pierce Westgate's corporate veil to hold Burnham and the Halpins jointly and severally liable.

¶ 10 During discovery, Cullen requested numerous documents, including Westgate's books, minutes, and records regarding corporate formalities, business activities, and debt. The Halpins failed to turn over many requested documents, claiming not to know what happened to them but suggesting that documents kept in their home were lost when they moved in 2007 and 2009.

¶ 11 While the case was pending, Westgate filed for bankruptcy in the United States District Court for the Western District of Pennsylvania. All claims against Westgate were stayed and, thus, only the claims against the other three defendants were litigated at trial.

¶ 12 A five-day bench trial took place in the circuit court of Cook County. Paul Cullen, plaintiff's secretary and vice-president, testified that he believed Robert Halpin, Burnham and Westgate "were one and the same" and that Halpin was the ultimate decision-maker on the project because "everything had to go through [him]." Cullen said he negotiated the construction contract with Halpin but afterward only spoke to him occasionally, mainly about money, and did not see him on site during the construction project. Cullen said Fukui had responsibility for approving payments but during the project he continuously failed to approve payment applications in a timely manner. Cullen also denied ever telling Halpin that he underbid the project and claimed that his company completed construction. On cross-examination, Cullen acknowledged that the construction contract was only with Westgate and that he did not ask Robert Halpin for a personal guarantee.

¶ 13 On adverse examination, Robert Halpin testified that Westgate and Burnham were separate entities and that Westgate held separate operating and capital accounts at Northern Trust Bank. He said Westgate retained Burnham as an independent contractor to develop and manage the project under the development agreement. Halpin acknowledged that under the development agreement with Westgate, Burnham was not entitled to any compensation for serving as manager of Westgate but was to be paid $400,000 under the development agreement as an independent contractor for performing essentially the same duties.

¶ 14 Halpin further testified that he and his wife kept the records for Westgate but acknowledged that neither of them is an accountant and did not know generally accepted accounting procedures. Halpin was aware of an obligation to preserve corporate documents during litigation but was unable to produce some documents in response to Cullen's

discovery requests because they were lost when he and his wife moved in 2007 and 2009. Halpin acknowledged he never invoiced Westgate for the work he did under the development agreement but said he provided monthly status reports to Westgate and kept records of funding requests, which were lost in the move. Halpin also acknowledged he was not regularly present on the jobsite, but said he participated in weekly site meetings telephonically and visited the site monthly.

¶ 15    As Burnham's agent Halpin was in charge of winding up the affairs of Westgate. Halpin testified that he did not advise Cullen before the arbitration hearing that Westgate had no funds because he did not think Westgate owed any money to Cullen. He stated that the money from the sale of warehouse facility first went to S&T Bank to repay the construction loan, then to Northern Trust to repay the Halpins' loan and Burnham's development fee. At Robert Halpin's request, Lori Halpin signed and distributed additional checks to pay in full all of Westgate's interest payments, legal fees, arbitration fees, and additional costs incurred during construction. Halpin said Westgate closed its operating and capital accounts at Northern Trust Bank in June 2007 and distributed any remaining money to Burnham even though he knew about the pending arbitration hearing and that there would be insufficient funds to pay an award in Cullen's favor. He said he did not consider keeping some money in reserve to pay a possible judgment in favor of Cullen. After December 31, 2007, Westgate conducted no further business and filed for bankruptcy in Pennsylvania.

¶ 16    On cross-examination, Halpin said that to keep costs down, Burnham agreed to defer its development fee for about two years. The Halpins also personally advanced additional expenses to Westgate and received corresponding reimbursement. Halpin testified that Cullen informed him a week or so after executing the contract that he had underbid the project and had insurmountable pay applications. Moreover, Halpin testified that Cullen walked off the project, forcing him to hire someone else to complete construction, and thus, he did not think Cullen would obtain a substantial arbitration award or that Westgate owed any fees to Cullen under the construction contract.

¶ 17    On adverse examination, Lori Halpin testified that she did bookkeeping for both Burnham and Westgate. She said she was not an employee of either company, although she acknowledged that her LinkedIn profile lists her as the operations manager for Burnham Partners. She was authorized to sign checks for both Westgate and Burnham. She also was primarily responsible for filing, organizing, and managing paperwork on the project but could not recall if Westgate or Burnham had a document retention policy. She said documents and records for the project were lost when she and her husband moved, but she did not know how and did not realize they were missing until her husband asked her to find documents in anticipation of this litigation.

¶ 18    At the close of evidence, Cullen requested an adverse inference against defendants, for failing to turn over requested documents regarding the Westgate project that were under their control and should have been produced through the exercise of reasonable diligence. Specifically, Cullen asserted it was entitled to the adverse inference that (i) Robert Halpin failed to honor the corporate structure of Westgate; (ii) Robert Halpin did not treat Westgate and Burnham as separate entities; (iii) Robert Halpin did not keep Burnham and Westgate separate from himself; (iv) the records would have shown Lori Halpin's true involvement as the person who ran Robert Halpin's business for him and that Westgate was a mere instrumentality or alter ego of Robert Halpin, Lori Halpin, and Burnham; (v) because Robert

Halpin made a loan to Westgate rather than a capital contribution as required by the LLC agreement, Westgate did not receive reasonably equivalent value in exchange for its payment to the Halpins; and (vi) Westgate did not receive reasonably equivalent value in exchange for its payment for the $400,000 it paid to Burnham and Halpin.

¶ 19 The trial court rejected Cullen's request for an adverse inference and on July 31, 2012, dismissed Cullen's amended complaint and entered a final judgment in favor of defendants. In its order, the trial court first found defendants did not owe a fiduciary duty to Cullen, reasoning, "the mere fact that a business transaction occurred is insufficient to support such a finding." The court also found that Cullen had no claim against defendants under the Delaware Limited Liability Company Act (Del. Code Ann. tit. 6, § 18-804 (West 2008)). That act provides that when winding up a limited liability company, assets "shall be distributed to creditors, including members and managers who are creditors." *Id*. Because Burnham was a member and a creditor, the court found that distributions to Burnham and the Halpins were not impermissible. The court also found defendants did not violate the Pennsylvania Contractor and Subcontractor Payment Act (73 Pa. Cons. Stat. Ann. § 501 *et seq*. (West 2008)), as Cullen's contract was with Westgate and no privity of contract existed between Cullen, Burnham, and the Halpins.

¶ 20 Next, the trial court concluded that Cullen failed to present "undisputed evidence" that Burnham through Halpin perpetrated fraud by transferring all of Westgate's assets to themselves and all other creditors except Cullen. The court found that the evidence suggested Burnham and Westgate were *bona fide* independent entities that kept proper corporate books and records and were properly funded. The court stated that Burnham properly earned its $400,000 development fee, which had been deferred for two years and that the Halpins were entitled to be repaid for their $175,000 loan to Westgate, that those disbursements were not made with the intent to hinder or defraud Cullen, and that the mere preference of one creditor over another does not constitute fraud. In addition, the court determined no evidence warranted piercing of the corporate veil or Cullen's alter ego theory. Lastly, the court stated that Cullen could have contracted to protect itself by, for instance, asking Robert Halpin for a personal guarantee or requiring a performance bond, but failed to do so.

¶ 21 Cullen filed an initial brief with this court, to which defendants responded, but did not file a reply brief. Under Supreme Rule 341(j), a reply brief is not required, and we proceed without benefit of a reply argument from Cullen. Ill. S. Ct. R. 341(j) (eff. Feb. 6, 2013).

¶ 22 During oral arguments, plaintiff's attorney cited a case, *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, which he asserted supports his adverse inference and fraudulent conveyance arguments. Because the appellate court's opinion in that case was filed after both parties filed their briefs, we permitted defendants' attorney to file a supplemental brief addressing the *Northwestern* case and plaintiff's attorney to file a reply brief.

¶ 23 ANALYSIS

¶ 24 Fraudulent Conveyance

¶ 25 Cullen contends the trial court erred in dismissing its fraudulent conveyance claim because Burnham and Halpin acted fraudulently under section 5(a) of the UFTA (740 ILCS 160/5(a) (West 2012)) in disbursing $470,129.58 of Westgate's assets to Burnham and

ultimately Halpin and his wife and $120,000 to the Northern Trust to repay the Halpins' loan to Westgate.

¶ 26    The UFTA was enacted to enable a creditor to defeat a debtor's transfer of assets to which the creditor was entitled. 740 ILCS 160/5 (West 2012). Illinois courts have divided fraudulent conveyance cases into two categories–fraud in fact and fraud in law. A cause of action under section 5(a)(1) of the UFTA is for actual fraud, often referred to as "fraud in fact." Proof of fraud in fact requires a showing of an actual intent to hinder, delay, or defraud the creditors. *Anderson v. Ferris*, 128 Ill. App. 3d 149, 153 (1984). A trial court's determination involving an intent to defraud is reviewed under the manifest weight of the evidence standard. See *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, ¶ 53; *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 54 (2009). A factual finding is against the manifest weight of the evidence only when the opposite conclusion is plainly evident or the finding is arbitrary, unreasonable, or not based in evidence. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35.

¶ 27    Constructive fraud or "fraud in law" does not require proof of actual intent to defraud. *In re Hennings Feed & Crop Care, Inc.*, 365 B.R. 868, 874 (Bankr. C.D. Ill. 2007) (citing *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997)). "Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent." *Id*. (citing *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005)). The test for determining the validity of a transfer under the UFTA is " 'whether or not it directly tended to or did impair the rights of creditors ***. *** [I]f the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent.' " *In re Martin*, 145 B.R. 933, 947 (Bankr. N.D. Ill. 1992) (quoting *Birney v. Solomon*, 348 Ill. 410, 414-15 (1932)); *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193-94 (2010).

¶ 28    Cullen contends that Robert Halpin and Burnham engaged in fraud in fact and violated section 5 the UFTA by making two transfers of Westgate's assets to Burnham, which Burnham later transferred to Robert Halpin–$400,000 on April 16, 2007, and $70,129.58 on July 11, 2007. Cullen also asserts Robert and Lori Halpin violated the UFTA by causing Westgate to transfer $120,000 of Westgate's assets to Northern Trust Bank to repay the loan Robert and Lori made to Westgate.

¶ 29    The UFTA sets forth 11 factors in making a determination as to actual intent: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 740 ILCS 160/5(b) (West 2012). See also *Kennedy v. Four Boys Labor Services, Inc.*, 279 Ill. App. 3d 361, 369 (1996). Proof of some or even all of the factors included in section 5(b) does not create a presumption that the debtor had the actual intent to

defraud. But the presence of these "badges of fraud" may, in sufficient number, give rise to an inference or presumption of fraud. *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996) (citing *Kaibab Industries, Inc. v. Family Ready Homes, Inc.*, 80 Ill. App. 3d 782, 786 (1978) (finding four "badges of fraud" sufficient to give rise to an inference of fraud)).

¶ 30    In dismissing Cullen's claim that defendants violated the Act, the trial court stated that Cullen "failed to adduce undisputed evidence showing that fraud has been [perpetrated] by the individual Defendants." The court's order did not address the section 5(b) factors in making that determination but instead found that Burnham and Westgate were separate entities, with separate accountants and bank accounts, that Westgate was properly funded, that Burnham earned its $400,000 development fee, which it had deferred for two years and that the Halpins were entitled to be repaid for their $175,000 loan to Westgate. The court also accepted Robert Halpin's testimony that Cullen said he had underbid on the project, that Cullen told him that it had change orders over $400,000, and that Cullen walked off the job, forcing Halpin to hire someone else to finish the project. Cullen denied these allegations.

¶ 31    We acknowledge that appellate courts give great deference to a trial court's credibility determinations, and do not substitute our judgment for that of the trial court. *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 47. But, even if the trial court's findings of fact are true, they are not dispositive on the issue of whether defendants fraudulently conveyed Westgate's assets. An examination of the factors listed in section 5(b) establishes the presence of a sufficient and significant number of "badges" of fraud giving rise to a presumption of fraud when Westgate, at the direction of Robert Halpin, transferred $400,000 to Burnham on April 16, 2007, $70,129.58 to Burnham on July 11, 2007, $120,000 to Northern Trust on April 5, 2007.

¶ 32    First, under the Act, where the debtor is a corporation, like Westgate, an "insider" includes a director of the corporation, an officer of the corporation, anyone in control of the corporation, and a relative of a person in control of the corporation. 740 ILCS 160/2(g)(2) (West 2012). An insider also includes an affiliate, or an insider of an affiliate as if the affiliate were Westgate, and the managing agent of Westgate. 740 ILCS 160/2(g)(4), (5) (West 2012). Burnham, as the managing agent of Westgate, constituted an insider. Robert Halpin was also an insider, as the sole member of Burnham, which held a 90% interest in Westgate and was in control. Lori Halpin was also an insider under the Act, as the "relative of a person in control."

¶ 33    Examining the other factors listed in section 5(b) of the Act, we observe that in June 2006, before any of the transfers occurred, Cullen filed a demand for arbitration, putting defendants on notice of a threatened lawsuit and the real possibility of a judgment against them. Robert Halpin testified that he believed Cullen's construction contract was substantially paid and did not believe Cullen would obtain a significant arbitration award. The trial court accepted this testimony, finding that Halpin had no reason to believe Cullen would obtain the award it did. The trial court also found that Halpin acted in "good faith" and "substantially complied" with the terms of the contract. These findings are contrary to the evidence. The record shows Westgate paid Cullen $1,728,000 of the $2,086,821 contract price, leaving a dispute over the remaining $358,821. Although Halpin asserted he did not think Cullen would be awarded damages because Cullen had walked off the job, the arbitrator, in entering the $457,416.37 award in Cullen's favor, determined that the amount

of work not performed by Cullen amounted to $3,680 or 1% of the contract price. Thus, at the time Halpin was winding up Westgate, he knew of the threat of a lawsuit and judgment and had the obligation not to dissipate the company's assets.

¶ 34   Although Halpin knew about the dispute over the amount owed under the contract and the upcoming arbitration hearing, he transferred all of Westgate's assets out of the company to Burnham and then to himself and his wife without disclosing the transfers to Cullen. The transfers of $120,000 on April 4, 2007 to Northern Trust and $400,000 to Burnham on April 16, 2007 were for substantially all of Westgate's assets. When he later transferred $70,129.58 on July 11, 2007, Westgate had no remaining funds with which to pay Cullen for the money owed on the judgment.

¶ 35   Further, Westgate did not receive "reasonably equivalent value" in exchange for either the $400,000 development fee to Burnham under the terms of the development agreement or the $120,000 transfer to the Northern Trust to repay the remainder of the Halpins' loan. First, the agreement to pay Burnham $400,000 as a "development fee" lacked consideration because Burnham and Halpin were obligated to perform those functions as the majority owner of Westgate. Further, Halpin failed to present any invoices or other evidence showing that Burnham performed any services above and beyond what it was already obligated to perform that warranted $400,000 development fee. In finding that Burnham was entitled to that fee, the trial court relied on Robert Halpin's testimony about services Burnham performed as project manager, including obtaining permits, selecting an architect, hiring engineers, and generally overseeing the construction project. The trial court stated that, "[Halpin] kept monthly reports giving Westgate a written status of the project," but disregarded Halpin's failure to produce a single monthly report or other documentation showing precisely what services Burnham performed. The trial court accepted the Halpins' explanation that they, along with other records requested by Cullen, "were *probably* lost in one of the moves" (emphasis added) and found that the fee was justified based on Halpin's testimony alone. We disagree and find that in the absence of evidence showing that Burnham performed services justifying the fee, Westgate did not receive reasonably equivalent value for the transfer of $400,000.

¶ 36   *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, is instructive. Sharif was the founder, president, chief executive officer, chief operating officer, and managing member of Randolph Equities, LLC, which rented commercial space in an office building. *Id.* ¶ 3. Randolph defaulted under its lease and Northwestern, the landlord, obtained a judgment against Randolph for $270,000. *Id.* ¶ 4. During the process of collection, Northwestern learned that Randolph had been engaged in litigation as a plaintiff against an unrelated third-party defendant and had settled that suit for $3.3 million. *Id.* ¶ 5. Instead of paying Northwestern, Sharif transferred most of the settlement money to himself and his ex-wife. *Id.* Northwestern filed a fraudulent transfer action against Sharif and the ex-wife. In pretrial discovery, Northwestern sought settlement information, related accounting records, and documents relating to funds Sharif provided to Randolph. *Id.* ¶ 8. Sharif provided some documents but claimed not to have any documentation regarding funds he provided Randolph, claiming they were in his accountant's possession. *Id.* After a bench trial, the trial court ruled in favor of the landlord, holding that the transaction displayed many of the "badges of fraud" under the UFTA. *Id.* ¶ 13. In affirming the trial court, the appellate court noted Sharif "failed to present objective, unbiased testimonial or documentary evidence, *e.g.*,

cancelled checks, bank transfers, loan agreements, to support that these transfers to himself were credible loan repayments to a *bona fide* creditor." *Id*. ¶ 33.

¶ 37    Similarly, here, the Halpins presented no unbiased testimony or documentary evidence to support a finding that the transfer of $400,000 from Westgate to Burnham and ultimately to themselves was in exchange for reasonably equivalent value.

¶ 38    The $120,000 transferred to the Northern Trust to repay the Halpins' loan was also not in exchange for "reasonably equivalent value." Under the LLC agreement, Burnham was required to make a capital contribution to Westgate. In lieu of making the required capital contribution, the Halpins took out a loan from the Northern Trust and in turn loaned Westgate $175,000. In transferring to the Northern Trust $120,000, the balance of the Halpins' loan, Westgate was repaying a capital contribution Burnham was required to pay. Thus, Westgate did not receive reasonably equivalent value for that payment.

¶ 39    Moreover, Westgate, through its transfers to Burnham, concealed its assets from Cullen and became insolvent after the transfers, all of which occurred just 2 months before the arbitration award was entered and 10 months after Cullen's demand for arbitration. Thus, 9 of the 11 "badges of fraud" weigh in favor of a presumption of fraud. A debtor may prefer one creditor over another, as long as he acts without fraudulent intent. As noted, the test is whether a transfer "directly tended to or did impair the rights of creditors." (Internal quotation marks omitted.) *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193-94. Westgate's transfers of all of its assets to Burnham and then to the Halpins shortly before a judgment was entered against Westgate did impair the rights of Cullen and were fraudulent in violation of section 5 of the UFTA.

¶ 40                                   Piercing the Corporate Veil

¶ 41    Cullen next contends the circuit court erred in denying his claim seeking to pierce Westgate's corporate veil to hold Burnham and the Halpins jointly and severally liable for the Pennsylvania judgment. In addressing this claim, the trial court stated that Cullen "failed to adduce undisputed evidence showing that fraud has been [perpetrated] by the individual Defendants." The court also stated that there was "insufficient evidence to find that Westgate and Burnham are not bona fide independent entities." Cullen asserts the trial court was wrong on both counts and that the court should have pierced the corporate veil based on defendants' fraudulent actions and because Westgate was merely the alter ego of Burnham and the Halpins.

¶ 42    Illinois law provides that efforts to pierce the corporate veil are governed by the law of the state of incorporation. *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 957 (2008). Westgate is a Delaware limited liability company so Delaware law applies to determine whether to pierce the corporate veil. "Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise." *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009). Thus, Delaware courts do not lightly disregard the corporate form. Absent sufficient cause the separate legal existence of a corporation will not be disturbed. Generally, the corporate veil may be pierced where there is fraud or where a subsidiary is in fact the mere alter ego of the parent. *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992). See also *Mabon, Nugent & Co. v. Texas American Energy Corp.*, No. Civ. A. 8578, 1988 WL 5492, at *3 (Del. Ch. Jan.

27, 1988) (" 'It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.' " (quoting *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968))).

¶ 43    " '[A]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.' " *Harco National Insurance Co. v. Green Farms, Inc.*, No. Civ. A. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) (quoting *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)).

¶ 44    Defendants contend there is no basis for piercing the corporate veil because Westgate kept separate records, was properly funded, and did not have funds that were commingled with the funds of Halpin or Burnham. But, as the trial court recognized, if "a fraudulent conveyance had occurred, then there would be a strong presumption for piercing the corporate veil." In addressing this issue, the trial court found that Cullen "failed to adduce undisputed evidence showing that fraud has been [perpetrated] by the individual [d]efendants." We disagree. As already discussed, Halpin fraudulently conveyed Westgate's funds to insiders, namely Burnham, himself, and his wife. Accordingly, the trial court erred in entering judgment in favor of defendants on Cullen's claim to pierce the corporate veil.

¶ 45                                         Fiduciary Duty

¶ 46    Lastly, Cullen argues the trial court erred in finding that Robert Halpin did not owe it a fiduciary duty. We agree with Cullen–the corporate veil should have been pierced and Burnham and Westgate are the same entity. Once Westgate became insolvent, Halpin, as the manager of Burnham, owed a fiduciary duty to Cullen as a creditor of Westgate to manage its assets properly and in the best interest of creditors. See *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 75 (2005) ("[O]nce a corporation becomes insolvent, the fiduciary duty of an officer is extended to the creditors of the corporation. [Citations.] The fiduciary duty arises because, from the moment a corporation becomes insolvent, its assets are deemed to be held in trust for the benefit of its creditors. [Citation.]"). Halpin breached that duty by making fraudulent, insider disbursements to Burnham, himself, and his wife, that left Westgate with no assets to pay the amount owed to Cullen on the contract.

¶ 47                                  Remedy Under the UFTA

¶ 48    Under section 8 of the UFTA, a creditor may obtain avoidance of a fraudulent transfer to the extent necessary to satisfy the creditor's claim or any other relief the circumstances may require. 740 ILCS 160/8(a)(1) (West 2012). Thus, because we find that defendants violated section 5 of the UFTA by disbursing all of Westgate's assets to themselves and other unsecured creditors when they knew about their potential liability to Cullen on its arbitration claim, we remand to the trial court with directions to enter judgment in favor of Cullen and against Burnham, Robert Halpin, and Lori Halpin. Cullen may thus pursue efforts to obtain

satisfaction of its judgment from defendants.

¶ 49                                    CONCLUSION

¶ 50        We reverse the circuit court's judgment in defendants' favor and remand for further proceedings consistent with this opinion.

¶ 51        Reversed and remanded with directions.