2022 IL App (1st) 201385-U

FIFTH DIVISION
January 14, 2022

No. 1-20-1385

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| DAVID WHITE, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUNERAL FINANCIAL SYSTEMS, Ltd., a | ) | |
| Former Illinois corporation ("FFS, Ltd."); | ) | |
| FUNERAL FINANCIAL SERVICES, Inc., a | ) | |
| Former Illinois corporation ("FFS, Inc."); and | ) | |
| FUNERAL FINANCIAL, LLC, an Illinois | ) | |
| limited liability company ("FF LLC"); RICHARD | ) | Nos. 04 L 050674 & 07 L 050421 |
| N. ABRAMS TRUST, a spendthrift trust, and | ) | (cons.) |
| UNKNOWN BENEFICIARIES ("RNAT"); and | ) | |
| RICHARD N. ABRAMS, RODNEY A. ABRAMS, | ) | |
| and BRIAN K. ABRAMS, all individually and all | ) | |
| as agents for FFS, Ltd., FFS, Inc., and FF LLC; | ) | |
| and UNKNOWN DIRECTORS and | ) | |
| SHAREHOLDERS of FFS, Ltd., and FFS, Inc.; | ) | |
| and UNKNOWN MEMBERS of FF LLC; and | ) | |
| RICHARD N. ABRAMS, individually, as | ) | |
| MANANGER of FF LLC, and as agent of RNAT, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Richard Abrams, Brian Abrams, Rodney Abrams, | ) | |
| Funeral Financial Services, LLC, f/k/a Funeral | ) | |
| Financial Services, LLC, Richard N. Abrams Trust | ) | |

| and Unknown Beneficiaries (RNAT), | ) | Honorable Edward S. Harmening, |
|---|---|---|
| Defendants-Appellees.) | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Trial court's judgment was not against the manifest weight of the evidence; defendants' motion to dismiss was properly granted; affirmed.

¶ 2   After a bench trial, judgment was entered for defendants on the claims of plaintiff, David White, under the Uniform Fraudulent Transfer Act (Fraudulent Transfer Act) (740 ILCS 160/1 *et seq.* (West 2000)) and section 12.75 of the Business Corporation Act of 1983 (Business Corporation Act) (805 ILCS 5/12.75 (West 2000)). Defendants consisted of certain members of the Abrams family and entities they were affiliated with—Funeral Financial Systems, Ltd. (FFS, Ltd.), Funeral Financial Services, Inc. (FFS, Inc.), and Funeral Financial, LLC (FF LLC). On appeal, White contends that he proved fraud in fact and fraud in law under the Fraudulent Transfer Act and that defendants violated section 12.75 of the Business Corporation Act. White also asserts that the trial court improperly dismissed another entity, the Richard N. Abrams Trust (RNAT), from White's third amended complaint. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4   White worked as an attorney for FFS, Ltd. from approximately September 1993 to November 1994. While employed, White fell and injured himself, and in December 1996, he filed a workers' compensation claim. White received an award from the Illinois Industrial Commission, but FFS, Ltd. did not have workers' compensation insurance and did not pay the award. Meanwhile, the assets of FFS, Ltd. were seized by Rodney Abrams and the company was later

involuntarily dissolved. Members of the Abrams family created other, similarly-named companies. This appeal addresses White's attempt to collect his award from those individuals and companies.

¶ 5                    A. The Origin of Funeral Financial Systems, Ltd.

¶ 6     When FFS, Ltd. was formed in 1985, Richard Abrams was president, Rodney Abrams was secretary, and Brian Abrams was treasurer. On May 1, 1992, Richard signed a note on behalf of FFS, Ltd. for a $3 million loan made by Burton Abrams—Richard's father—Rodney, and/or Richard. The same day, FFS, Ltd. executed a line of credit and security agreement with Burton, Rodney, and Richard, granting them a security interest

> "to the maximum extent permitted by law in all of the following collateral whether in existence as of the date hereof or acquired hereafter, and in all proceeds thereof: All of our accounts and personal property and fixtures (including but not limited to chattel paper, instruments, general intangibles, documents and goods in which borrower has any interest)."

A financing statement was filed with the Illinois Secretary of State on July 12, 1999. Among the listed secured creditors were Burton, Rodney, and Brian.

¶ 7                    B. White's Workers' Compensation Claim

¶ 8     According to White's third amended complaint, which was filed on October 29, 2010, the Illinois Industrial Commission issued a final award in favor of White for $67,048.14 in February 2003. White filed his original complaint against FFS, Ltd. on June 28, 2004. In August 2005, the circuit court entered a default judgment against FFS, Ltd. for $67,048, plus legal fees and costs, pursuant to section 19(g) of the Workers' Compensation Act (820 ILCS 305/19(g) (West 2002)).

¶ 9                    C. Subsequent Funeral Financial Entities

¶ 10    As further alleged in White's third amended complaint, in 2002, Funeral Financial Services, Inc. (FFS, Inc.) acquired and operated the business of FFS, Ltd. FFS, Inc. was formed with the involvement of Richard and Rodney. On January 2, 2003, FFS, Ltd. was involuntarily dissolved by the Illinois Secretary of State for failure to file an annual report. White did not receive notice of the dissolution. On May 3, 2003, Funeral Financial, LLC (FF LLC) was formed, with Rodney and Brian listed as managers. On August 1, 2007, Rodney conveyed the entire ownership of FF LLC to RNAT for $45,649.

¶ 11    White pursued claims against all three Funeral Financial entities, RNAT, and Richard, Rodney, and Brian. White stated that the three Funeral Financial entities operated the same or substantially the same business. Further, RNAT was liable to White because it was the successor in interest of FF LLC. Among other relief, White requested that the court declare void any transfers made by the Funeral Financial entities, RNAT, and Richard, Rodney, and Brian to the extent needed to satisfy FFS, Ltd.'s obligation to White. White also alleged that Richard, Rodney, and Brian were personally liable under the Business Corporation Act (805 ILCS 5/1.01 *et seq.* (West 2000)) for not notifying White of FFS, Ltd.'s dissolution.

¶ 12                        D. RNAT's Motion to Dismiss

¶ 13    RNAT filed a motion to dismiss the third amended complaint under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2010)). RNAT stated in part that it only acquired a membership interest in one of the Funeral Financial entities and the acquisition was made free and clear of any claims or liabilities. The circuit court agreed and granted the motion to dismiss. After White filed a motion to reconsider, the circuit court reversed itself. Pursuant to a

motion to reconsider that order filed by RNAT, the circuit court later dismissed RNAT again, stating that its initial conclusion was correct.

¶ 14                                    E. Bench Trial

¶ 15    The matter proceeded to a bench trial in January 2020, where Richard, Rodney, Brian, and White testified. We summarize each of their testimonies in turn.

¶ 16    Explaining the identities of people listed in certain documents, Richard stated that Burton was his father and Rodney and Brian were Richard's sons. Richard had been the president and an officer of FFS, Ltd. and its other officers were Rodney and Brian. Richard recalled that around January 2002, the secured creditors of FFS, Ltd. seized the company's assets, which included accounts receivable, furniture, fixtures, and any cash. The secured creditors used the seized assets to form FFS, Inc. FFS, Ltd. was left insolvent. Richard became president and a director and shareholder of FFS, Inc. He owned 30% of the company and Rodney owned 70% of the company. When FFS, Ltd. was involuntarily dissolved in January 2003, Burton, Richard, and Rodney had loaned FFS, Ltd. around $4 million, with Rodney having loaned the lion's share.

¶ 17    Rodney testified that he was the only secured creditor of FFS, Ltd. to seize its assets. At the time, Rodney's loans to FFS, Ltd. were much greater than the value of anything that the company had. Rodney used the seized assets to create FFS, Inc., which was incorporated in March 2002. The record contains an affidavit completed by Rodney in 2004 for another matter. There, he averred that between 1992 and 2001, he loaned more than $2.5 million to FFS, Ltd. Between 1999 and 2001, Rodney became increasingly concerned about FFS, Ltd.'s ability to repay the loan. An insurance company had obtained a judgment against FFS, Ltd. in federal court and FFS, Ltd. was also facing a workers' compensation claim that was not covered by insurance. In late 2001, it was contemplated that the note would be called and FFS, Ltd.'s assets would be liquidated. Instead, it

was agreed that the assets would be used to form FFS, Inc., which would assume FFS, Ltd.'s obligations under the note, personally guaranteed by Richard.

¶ 18    Brian testified that FFS, Ltd. sought out a loan from Rodney, rather than from a bank, because the company was struggling in the late 1990s and early 2000s and Rodney's loan would be friendlier. For his part, Rodney earned more interest than he would have from a bank. When FFS, Ltd. dissolved, it owed Brian—also a secured creditor—$250,000, which had never been repaid. There were no assets from FFS, Ltd. to distribute when it dissolved. FF LLC was formed after Rodney received a judgment for a loan to FFS, Inc., in anticipation of getting a turnover order so that the assets of FFS, Inc. could be turned over to Rodney. The default judgment that supported the turnover order was ultimately vacated. Rodney owned 100% of the membership interest of FF LLC. Rodney later sold all of his membership interest in FF LLC to RNAT. Meanwhile, Richard's obligation to pay Rodney continued, as Rodney had not recouped his loan to FFS, Ltd.

¶ 19    White testified that while employed by FFS, Ltd. in 1994, he was injured when he attended a court call or visited a library. White stated that he was not given notice of FFS, Ltd.'s dissolution. He acknowledged that after he received his workers' compensation award in February 2003, he did not record the award with any recorder of deeds office or the Illinois Secretary of State. White also did not file any record of the 2005 default judgment against FFS, Ltd. with any state or county agency.

¶ 20    In his written closing argument, White contended in part that he sufficiently proved that defendants violated the Fraudulent Transfer Act. White asserted that the transfer from FFS, Ltd. to FFS, Inc. was a *de facto* merger made to avoid FFS, Ltd.'s creditors. White noted that no evidence of Brian's loans were offered to support his status as a secured creditor. White further stated that he was not notified about the dissolution of the Funeral Financial entities.

¶ 21    In defendants' written closing argument, defendants contended in part that any rights that White had as an unsecured judgment creditor of FFS, Ltd. were junior to the prior and still unsatisfied secured claims held by the individual defendants. Defendants explained that under the Fraudulent Transfer Act claim, the assets at issue were receivables held by FFS, Ltd. at the time of Rodney's levy, transfer to FFS, Inc., and FFS, Ltd.'s dissolution. However, property is not an asset under the Fraudulent Transfer Act if it is encumbered by a valid lien, and here, the individual defendants held valid, perfected security interests in FFS, Ltd.'s receivables during the relevant time. Defendants also asserted that FFS, Ltd.'s assets were not transferred to an insider and White did not prove an unlawful intent to hinder or delay. Defendants further stated that White's claim under the Business Corporation Act was meritless because FFS, Ltd. did not bar creditors' claims. Additionally, White did not prove that he could or would have collected on his claim even if he had been notified of FFS, Ltd.'s dissolution.

¶ 22    On September 9, 2020, the court entered judgment for defendants. In an oral ruling, the court stated that there was no dispute that White was injured, received a judgment, and was not paid for his injury. Yet, Rodney had a perfected interest through a Uniform Commercial Code (UCC) filing for an amount certain and there was no caselaw to support the position that White could jump ahead of Rodney. The court further found that there was no collusion between the individual defendants. Though White should be compensated for his injury, there were no funds in the corporation to do so.

¶ 23    White filed a motion to reconsider, which the court denied on November 23, 2020. White timely appealed.

¶ 24                                II. ANALYSIS

¶ 25                           A. Fraudulent Transfer Act

¶ 26    White contends that the transfer of assets should be avoided because he proved both fraud in fact and fraud in law under the Fraudulent Transfer Act. White further asserts that defendants cannot rely on their financing statement to support their status as secured creditors, noting that the financing statement was filed seven years after the security agreement and over two years after FFS, Ltd. became a respondent in the workers' compensation action. White also argues that the trial court's application of the secured creditor defense contravenes the express purpose of the Fraudulent Transfer Act.

¶ 27    Our standard of review after a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. A judgment is against the manifest weight of the evidence when it is arbitrary, unreasonable, not based on the evidence, or the opposite conclusion is apparent. *Id*. This court will not overturn a trial court's judgment if there is evidence to support it. *Steiner Electric Co. v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 49. We may affirm the trial court's judgment on any basis in the record, regardless of the trial court's reasoning. *Bell Leasing Brokerage, LLC v. Roger Auto Service, Inc.*, 372 Ill. App. 3d 461, 469 (2007).

¶ 28    The Fraudulent Transfer Act enables a creditor to defeat a debtor's transfer of assets to which the creditor was entitled. *A.G. Cullen Construction, Inc. v. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 26. The purpose of the statute " 'is to invalidate otherwise sanctioned transactions made with a fraudulent intent.' " *Sharif*, 2014 IL App (1st) 133008, ¶ 16 (quoting *In re Marriage of Del Giudice*, 287 Ill. App. 3d 215, 218 (1997)). An action under the Fraudulent Transfer Act does not involve personal liability—rather, it tries to avoid the transfer and seeks the actual assets transferred. *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 187 (2010).

¶ 29    For the Fraudulent Transfer Act to apply, there must be a "fraudulent transfer of 'an asset' or 'an interest in an asset.' " *Pluciennik v. Vandenberg*, 2018 IL App (3d) 160726, ¶ 17. If the property conveyed is not an asset under the Fraudulent Transfer Act, then the statute does not apply. See *id*. White does not pinpoint the property that was allegedly fraudulently transferred from FFS, Ltd., and appears to challenge the entire conveyance that occurred from FFS, Ltd., to Rodney's levy, and to the formation of FFS, Inc. So, the threshold question is whether what was conveyed from FFS, Ltd. was an asset under the Fraudulent Transfer Act.

¶ 30    The Fraudulent Transfer Act defines an asset as "property of a debtor, but the term does not include *** property to the extent it is encumbered by a valid lien." 740 ILCS 160/2(b)(1) (West 2000). A lien is "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement." 740 ILCS 160/2(h) (West 2000). A valid lien is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." 740 ILCS 160/2(m) (West 2000).

¶ 31    Whether property is an asset depends on whether that property is subject to a security interest, the rules for which are governed by article 9 of the UCC. See *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill. App. 3d 370, 376 (1995). A security interest attaches when it becomes enforceable against the debtor, which occurs when: 1) the security interest was given for value, 2) the debtor has rights in the collateral, and 3) there is a security agreement describing the collateral. *Heartland Bank & Trust v. The Leiter Group*, 2014 IL App (3d) 130498, ¶ 18 (citing 810 ILCS 5/9-203(a), (b)(3A) (West 2010)). When security interests conflict, the first to attach has priority, and generally, the holder of a perfected security interest has priority over the interests of unsecured creditors. *Midwest Decks, Inc.*, 272 Ill. App. 3d at 377. A perfected security

interest also has priority over a lien creditor. *Sign Builders, Inc. v. SVI Themed Construction Solutions, Inc.*, 2015 IL App (1st) 142212, ¶ 16. For most collateral, a security interest is perfected by filing a financing statement with the Illinois Secretary of State. *Midwest Decks, Inc.*, 272 Ill. App. 3d at 377. A financing statement is valid for five years from the date of filing. 810 ILCS 5/9-403(2) (West 2000).

¶ 32    Defendants assert that White forfeited the issue of whether the security interest was valid because it is raised for the first time on appeal. See *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 38 (issues not raised in the trial court are forfeited and may not be raised for the first time on appeal). We agree that, in the trial court, White did not challenge the validity of the security interests at issue and so the matter is forfeited. Forfeiture aside, White's arguments are unpersuasive.

¶ 33    Here, at the time of the transfer, the property of FFS, Ltd. was encumbered by a valid lien in the form of a perfected security interest held by Rodney and other members of the Abrams family. A note describing the loan was executed in 1992. Security for the loan included all of FFS, Ltd.'s accounts and personal property and fixtures, as described in a security agreement. The secured creditors perfected their security interest by filing a financing statement in July 1999, which was valid for five years. White states that the delay between the security agreement and financing statement undermines the security interest. White cites *In re Millivision, Inc.*, 474 F.3d 4 (1st Cir. 2007), where a five-day delay in filing a financing statement made it possible for a bankruptcy trustee to avoid a security interest. But there, creditors filed a bankruptcy petition during that five-day period. *Id.* at 5. White has presented no evidence of a competing creditor of FFS, Ltd. between 1992 and 1999, whether himself or some other entity.

¶ 34    As a second basis for challenging the validity of the security interest, White contends that because the financing statement expired in 2004, any security interest that was perfected became unperfected and was deemed never to have been perfected as against a purchaser for value. White also states that because Rodney seized the collateral, rather than purchased it, defendants are not secured creditors and White stands in a similar position as defendants.

¶ 35    Under the version of the UCC that was in effect at the time, once the financing statement lapsed, the security interest became unperfected and deemed to have been unperfected as against a person who became a purchaser or lien creditor before the lapse. 810 ILCS 5/9-403(2) (West 2000). To be clear, White never became a lien creditor before 2004. White received a final award from the Illinois Industrial Commission in February 2003. White filed his original complaint against FFS, Ltd. in June 2004. The circuit court entered a default judgment against FFS, Ltd. in August 2005. There is no evidence of White having taken any action to become a lien creditor before 2004 or even after the 2005 judgment. See 810 ILCS 5/9-301(3) (West 2000) (lien creditor is someone who has acquired a lien on the property involved by attachment, levy, or the like). Further, there is no evidence of any other purchaser or lien creditor who took priority over Rodney and the other secured creditors between 1999 and 2004. The security interest in FFS, Ltd.'s property was perfected between 1999 and 2004.

¶ 36    The conveyance occurred in early 2002, when Rodney seized FFS, Ltd.'s property and used it to form FFS, Inc. At the time of the conveyance, FFS, Ltd.'s property was encumbered by a valid lien in the form of a perfected security interest held by Rodney and other members of the Abrams family. Thus, the property was not an asset under the Fraudulent Transfer Act. See 740 ILCS 160/2(b), (l) (West 2000) (transfer is every mode of disposing of an asset, but assets do not

include property encumbered by a valid lien). The trial court properly found that defendants did not violate the Fraudulent Transfer Act.

¶ 37                                B. Business Corporation Act

¶ 38    White next contends that defendants violated section 12.75 of the Business Corporation Act (805 ILCS 5/12.75 (West 2000)) because they did not give White notice of FFS, Ltd.'s dissolution. White asserts that the failure to give notice imposes personal liability on Richard, Rodney, and Brian for White's default judgment against FFS, Ltd.

¶ 39    Section 12.75 of the Business Corporation Act (805 ILCS 5/12.75 (West 2000)) states that "[a] dissolved corporation may bar any known claim against it, its directors, officers, employees or agents, or its shareholders or their transferees" by following a stated procedure. Within 60 days of the effective date of dissolution, the dissolved corporation must notify claimants of certain information, including that the corporation has been dissolved, the deadline by which the dissolved corporation must receive the claim, and a statement that the claim will be barred if not received by the deadline. 805 ILCS 5/12.75(b) (West 2000). There are consequences for failing to notify known claimants. Section 8.65(a)(2) of the Business Corporation Act states:

> "If a dissolved corporation shall proceed to bar any known claims against it under Section 12.75, the directors of such corporation who fail to take reasonable steps to cause the notice required by Section 12.75 of this Act to be given to any known creditor of such corporation shall be jointly and severally liable to such creditor for all loss and damage occasioned thereby." 805 ILCS 5/8.65(a)(2) (West 2000).

¶ 40    Neither White nor defendants address whether sections 12.75 and 8.65 apply here, where the corporation was involuntarily dissolved. See *People v. Parker*, 30 Ill. 2d 486, 488 (1964) (statute imposes liability on directors of a corporation "which has filed a statement of intent to

dissolve and fails to mail notice of such action to known creditors); *Kennedy v. Four Boys Labor Service, Inc.*, 279 Ill. App. 3d 361, 366 (1996) (sections 8.65 and 12.75 of the Business Corporation Act impose individual liability on a director "who causes the corporation to be dissolved without providing proper notice to known creditors of the corporation").

¶ 41    Assuming that the sections apply, White failed to show harm from the lack of notice. A defendant's liability for failing to send notice of dissolution "is limited to any harm caused by such lack of notice." *Swager v. Couri*, 77 Ill. 2d 173, 192 (1979). Further, any harm is limited to the value of the assets, if any, improperly distributed on dissolution. *Id*. See also *Thomas v. Frederick J. Borgsmiller, Inc.*, 155 Ill. App. 3d 1057, 1065 (directors liable only for the amount of corporate assets distributed to non-creditors on dissolution). It is the plaintiff's burden to prove any loss caused by the failure to receive notice and that there were corporate assets distributed on dissolution. *Id*.

¶ 42    As noted above, Rodney seized the assets[1] of FFS, Ltd. and formed FFS, Inc. in January 2002. In January 2003, FFS, Ltd. was involuntarily dissolved by the Illinois Secretary of State. According to the trial testimony, Rodney's loans to FFS, Ltd. were much greater than the value of anything the company had. Brian stated that when FFS, Ltd. dissolved, there were no assets left to distribute. With no assets to distribute at all, no assets were improperly distributed either. Also, unlike Rodney and other secured creditors, plaintiff did not have a secured interest in FFS, Ltd.'s assets and would not have gotten paid in any event. White did not show harm from the lack of notice. The trial court correctly entered judgment for defendants on this claim.

¶ 43                                  C. Motion to Dismiss

---

[1] In this section of our order, we use the term "assets" because that was the term used by the witnesses at trial and in cases discussing the Business Corporation Act. This does not change our conclusion that no assets were transferred under the Fraudulent Transfer Act.

¶ 44    Lastly, White contends that the trial court improperly granted RNAT's motion to dismiss. White asserts that RNAT was a subsequent transferee under the Fraudulent Transfer Act.

¶ 45    A section 2-619 motion to dismiss admits the legal sufficiency of the complaint, but asserts affirmative matter that defeats the plaintiff's claim. *Andrews v. Gonzalez*, 2014 IL App (1st) 140342, ¶ 16. On appeal, the question is whether the existence of a genuine issue of material fact should have precluded the dismissal or whether dismissal was proper as a matter of law. *Ryan v. Fox News Television Stations, Inc.*, 2012 IL App (1st) 120005, ¶ 11. We may affirm on any basis in the record. *Perez v. Chicago Park District*, 2016 IL App (1st) 153101, ¶ 11.

¶ 46    The theory behind White's pursuit of RNAT is that judgment under the Fraudulent Transfer Act may be entered against a subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee. See 740 ILCS 160/9(b)(2) (West 2000). For RNAT to be liable as a subsequent transferee, there must have first been a transfer of an asset. And as explained above, there were no assets transferred under the Fraudulent Transfer Act because FFS, Ltd.'s property was encumbered by a valid lien. See 740 ILCS 160/2 (West 2000). Without an initial transfer of assets, RNAT could not be liable under the Fraudulent Transfer Act. RNAT was properly dismissed.

¶ 47                                     III. CONCLUSION

¶ 48    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 49    Affirmed.